**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No. 19-mj - 2859 - McAliley

**UNITED STATES OF AMERICA**

v.

**EDUARDO RUBAL, a/k/a "PROFE";**
**HECTOR SUAREZ GONZALEZ, a/k/a "PANA";**
**ALBERTO ORIAN GONZALEZ-DELGADO, a/k/a**
**"MICHAEL";**
**VICENTE GONZALEZ ACOSTA, a/k/a "PURO";**
**ALEXANDER FERNANDEZ;**
**JOSE CARLOS VALLADARES RIVERA;**
**YAXING TAPANES, a/k/a "CHAMACO"; and**
**ANTONIO JIMENEZ,**

        **Defendants.**

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the
    United States Attorney's Office prior to October 14, 2003?  ___ Yes  X  No

2.  Did this matter originate from a matter pending in the Central Region of the
    United States Attorney's Office prior to September 1, 2007?  ___ Yes  X  No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

ROBERT ZINK, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION

BY: _____
Emily M. Gurskis
Florida Special Bar No. A5502499
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.

Washington, D.C. 20005
Phone: (202) 203-9186
Email: emily.gurskis@usdoj.gov

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America )
)
Eduardo Rubal, a/k/a "Profe"; Hector Suarez Gonzalez, )
a/k/a "Pana"; Alberto Orian Gonzalez-Delgado, a/k/a ) Case No. 19-mj-2859-McAliley
"Michael"; Vicente Gonzalez Acosta, a/k/a "Puro"; )
Alexander Fernandez; Jose Carlos Valladares Rivera; )
Yaxing Tapanes, a/k/a "Chamaco"; and Antonio Jimenez. )

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ October 2016 - present _____ in the county of _____ Miami-Dade _____ in the

_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1956(h) | Conspiracy to Commit Money Laundering |
| 18 U.S.C. 1347 & 1349 | Conspiracy to Commit Health Care Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jamie R. Garman, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 05/30/2019 _____

_____
*Judge's signature*

City and state: _____ Miami, Fla _____

Hon. William Matthewman, U.S. Magistrate Judge
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

No._____

UNITED STATES OF AMERICA

v.                                                          **FILED UNDER SEAL**

**EDUARDO RUBAL a/k/a "PROFE,"**
**et al.,**

        **Defendants.**
_____/

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

    I, Jamie R. Garman, being duly sworn, depose and state as follows:

### A.  INTRODUCTION AND BACKGROUND OF AFFIANT

    1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, currently assigned to the Miami, Florida, Field Division.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and therefore am empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516(1), including but not limited to offenses involving money laundering; wire, bank, and mail fraud; health care fraud; aggravated identity theft; and conspiracies to commit the foregoing offenses.

    2.    I have been a Special Agent of the FBI since March of 2018.  I have been assigned to the Miami Field Division since July 2018.  I am currently assigned to the South Florida Health Care Fraud Strike Force and am responsible for conducting investigations of federal crimes, including health care fraud offenses; money laundering; and mail, bank, and wire fraud.  Prior to becoming a Special Agent, I was employed as an Assistant United States Attorney ("AUSA") in

the Southern District of Florida for approximately five years. During that time, I was assigned to both the Major Crimes Section and the High Intensity Drug Trafficking Area Task Force in Miami. Prior to my employment as an AUSA, I was employed as a law clerk to the Honorable Cecilia M. Altonaga, United States District Court for the Southern District of Florida, for approximately one year.

3.      As part of my training with the FBI, I attended a six-month new agent training at the FBI Academy in Quantico, Virginia, which included training regarding money laundering investigations. During my time in law enforcement, I have been assigned investigations dealing with money laundering, bank fraud, wire fraud, health care fraud, and other crimes committed through various electronic means.

4.      Based upon my training and experience, I have become familiar with the investigative methods and enforcement of federal money laundering and financial fraud laws. I have also become versed in the methodology utilized in money laundering, the specific type of language used by individuals involved in financial fraud, and the unique patterns employed by fraud organizations. I have also been involved in numerous physical surveillances, electronic surveillances, and wire surveillances. I have participated in numerous Title III wire surveillances. Additionally, I have been involved in the arrest, prosecution and debriefing of individuals for various financial fraud violations.

5.      As a result of my law enforcement experiences I know that individuals involved in health care fraud, financial fraud, and money laundering often communicate via cellular telephones, text messages, emails, or through Internet-based accounts. I am aware that individuals often utilize computers, cellular telephones, and other electronic devices (collectively, "electronic devices") to access accounts and claims, communicate with one another, or to find information on

2

the Internet in furtherance of their fraudulent activities. I am aware that electronic devices provide individuals involved in financial fraud with mobile access and control over their illegal trade. As a result of my law enforcement experiences, I have found that individuals involved in fraud often speak in coded language about their criminal activity to disguise their conversations about criminal activity. I also know that individuals involved in financial fraud routinely utilize false information when registering their cellular phones and utilize cellular phone numbers and cellular phones for short periods of time.

### B. BASIS AND PURPOSE OF AFFIDAVIT

6. The information contained in this affidavit is submitted for the purpose of supplying probable cause for the issuance of a criminal complaint charging Eduardo Rubal, a/k/a "Profe" ("PROFE"); Hector Suarez Gonzalez, a/k/a "Pana" ("PANA"); Alberto Orian Gonzalez-Delgado, a/k/a "Michael" ("MICHAEL"); Vicente Gonzalez Acosta, a/k/a "Puro" ("PURO"); Alexander Fernandez, a/k/a "Alex," a/k/a "Socio" ("ALEX"); Jose Carlos Valladares Rivera ("JC"); Yaxing Tapanes, a/k/a "Chamaco" ("CHAMACO"); and Antonio Jimenez ("JIMENEZ") (collectively, the "Fraud and Money Laundering Organization" or "FMLO"), beginning at least as early as in or around October 2016 and continuing through the present, with (a) conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h) and (b) conspiracy to commit health care fraud, in violation of Title 18, United States Code, Sections 1347 & 1349.

7. As described in more detail below, there is probable cause to believe that PROFE, PANA, MICHAEL, PURO, ALEX, JC, CHAMACO, and JIMENEZ knowingly and willingly defrauded the Medicare program, submitting and causing the submission of false claims for reimbursement of home health services allegedly provided—services that were never provided—

3

and fraudulently obtained money from the Medicare program and subsequently laundered. There is probable cause to believe that such fraud is ongoing.

       8.     I have personally participated in the investigation into the activities of the charged individuals. As such, I am thoroughly familiar with the information contained in this Affidavit, either through personal investigation, physical and electronic surveillance, and through information provided by law enforcement agents, documents, and witnesses. Each and every fact known to me and law enforcement about this case is not included in this Affidavit; rather, I submit information sufficient to establish probable cause that the charged offenses were committed.

## C.  OVERVIEW OF FACTS SUPPORTING PROBABLE CAUSE

### The Medicare Program

       9.    Medicare is a federal health care program that provides benefits to persons who are 65 or older or disabled. Medicare is administered by the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries." Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

       10.    Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. Part A of the Medicare program covers certain eligible home health care costs for medical services provided by HHAs to beneficiaries who require home health services because of an illness or disability that causes them to be homebound.

4

11.     Medicare Part A covers claims submitted by HHAs only if the beneficiary qualifies for home health benefits. To qualify for home health benefits: (a) the beneficiary must be confined to the home; (b) the beneficiary must be under the care of a physician who specifically determines there is a need for home health care and establishes a plan of care ("POC"); and (c) the determining physician must sign a certification statement specifying that the beneficiary needs certain specified home health services, that the beneficiary is confined to his/her home, that the POC for furnishing services has been established and is periodically reviewed, and that the services are furnished while the beneficiary is under the care of the physician who has established the POC.

12.     CMS separately contracts with companies in order to review HHAs' claims data. Such companies are responsible for performing specific safeguard functions for the Medicare program, including reviewing HHAs' claims for potential fraud, waste, and/or abuse. Negative findings after a review may result in suspension of payment, payment denial, declaration of overpayment, and even exclusion from participation in the Medicare program or a referral for criminal prosecution.

13.     TrustSolutions LLC was the Program Safeguard Contractor for Medicare Part A and Part B in Michigan until April 24, 2012, when it was replaced by Cahaba Safeguard Administrators LLC. Cahaba was replaced by AdvanceMed in May 2015.

14.     Medicare allows HHAs to submit requests for partial payment prior to the end of a 60-day home health episode to offset their immediate costs associated with providing services to a beneficiary. A Request for Anticipated Payment ("RAP" Claim, using Type of Bill 322) is submitted by the HHA to the Medicare Administrative Contractor ("MAC") indicating the start of service date for a beneficiary, as well as the patient's condition. Under the Prospective Payment System ("PPS"), Medicare makes a split percentage payment for most Home Health PPS episode

5

periods. The first payment is for a RAP, and the second and final payment is for a "claim." RAP payments are designed to ensure home health agencies have sufficient cash flow. Based on my training and experience, I know that in many fraudulent RAP schemes, the "agency" requests and collects the initial RAPs and ceases operation before filing final claims to reduce the likelihood of detection by law enforcement.

## Overview of the Scheme

15.     The FMLO is involved in a health care fraud scheme in which they recruit and direct nominee owners to fraudulently purchase home health agencies ("HHAs"), including HHAs in Michigan, when the true owners include PROFE, PANA, and MICHAEL. The members of the FMLO primarily live in Miami, Florida, in the Southern District of Florida, and direct the scheme from Miami. The nominee owners are directed to open corporations in their own names in Florida and other states, together with corresponding personal and corporate bank accounts at several different banks. Once the accounts are opened, the nominee owners are not permitted to keep the debit cards and/or checks associated with the accounts; rather, the nominee owners relinquish control of the accounts to the others involved in the scheme.

16.     After the acquisition of the HHA is complete, the group begins fraudulently billing Medicare for services that are never provided and they receive 60% of the reimbursement for claims submitted to Medicare before they are required to provide supporting documentation that would legitimize the claims. They then funnel that money paid by Medicare for services that were never provided through several layers of shell companies and bank accounts in an effort to launder the money before withdrawing it as cash, including at ATMs and at check cashing stores in Miami.

17.     When the group either withdraws all of the fraudulently-obtained money or when authorities begin shutting down the accounts, the group requires the nominee owners to flee to

6

Cuba. There, the group confiscates the nominee owners' passports and pays a portion of the promised amount in an effort to ensure that the nominee owner is unavailable to provide inculpatory information to law enforcement about this scheme, or to testify against the group profiting from the fraud.

## Relevant Individuals and Entities

18.     PROFE is a resident of Miami-Dade County.  PROFE oversees critical aspects of the scheme, including the purchase of HHAs and the money laundering structure.

19.     PANA is a resident of Miami-Dade County.  PANA is also a leader and organizer of the FMLO.  PANA oversees the FMLO's finances and "business" operations.

20.     MICHAEL is a resident of Miami-Dade County.  MICHAEL is also a leader and organizer of the FMLO.  MICHAEL's role includes oversight of the FMLO's Medicare billing. More specifically, MICHAEL causes the submission of fraudulent claims to Medicare for services never rendered and assists in structuring the money laundering activities of the group.  Together, PROFE, PANA and MICHAEL direct the actions of the other members of the criminal organization through PROFE's instructions to the others.

21.     ALEX is a resident of Miami-Dade County.  ALEX acts as a lieutenant for PROFE, PANA, and MICHAEL.  ALEX is responsible for recruiting individuals like the CHS to open bank accounts and shell companies in order to launder funds.  ALEX further handles monetary issues in Miami, including intermittently paying a nominee owner for work done in connection with the conspiracy and withdrawing the proceeds of health care fraud from a number of bank accounts.

22.     PURO is a resident of Miami-Dade County.  Like ALEX, PURO acts as a lieutenant for PROFE, PANA, and MICHAEL.  PURO manages the individuals recruited by ALEX when they travel in connection with the scheme to open bank accounts and shell corporations and transfer

7

the proceeds of health care fraud to various accounts in an effort to launder the money, including in Miami, Detroit, and Chicago.

23.     JC is a resident of Miami-Dade County.  JC's role in the fraud scheme includes obtaining new telephones for members of the FMLO to use in furtherance of their criminal activities and facilitating the opening of accounts at various check cashing stores.

24.     CHAMACO is a resident of Miami-Dade County.  CHAMACO assists in recruiting and managing the nominee owners in Miami, Detroit, and Chicago.

25.     JIMENEZ is a resident of Miami-Dade County.  JIMENEZ is a nominee owner who has many corporations and accounts in his name, which the FMLO uses to launder fraud proceeds.

26.     A confidential human source ("CHS") also acts as a nominee owner who has many corporations and accounts in the CHS's name, which the FMLO uses to launder the fraud proceeds.

27.     Care Home Health, Inc. ("Care"), located at 24500 Ford Road, in Dearborn Heights, Michigan is a Michigan corporation, with its principal place of business in Wayne County, in the Eastern District of Michigan.  It purports to provide home health care services to eligible Medicare beneficiaries.

28.     Nu-Wave Home Health Care ("Nu-Wave"), located at 32540 Schoolcraft Road, Suite 320, in Livonia, Michigan, is a Michigan corporation, with its principal place of business in Wayne County, in the Eastern District of Michigan.  It purported to provide home health care services to eligible Medicare beneficiaries.

29.     Tri-County Homecare ("Tri-County") located at 30700 Telegraph Road, Suite 1540, in Bingham Farms, Michigan is a Michigan corporation, with its principal place of business

in Oakland County, in the Eastern District of Michigan. It purported to provide home health care services to eligible Medicare beneficiaries.

**Overview of the Investigation**

30.     The United States, including the FBI and the United States Department of Health and Human Services, Office of Inspector General ("HHS"), is conducting this criminal investigation of the FMLO's criminal conduct.

31.     In early November 2018, the CHS began voluntarily providing information to the FBI regarding a health care fraud and money laundering scheme.[1] The CHS explained that in or around 2014, ALEX first offered the CHS a "job" opening bank accounts and companies in the CHS's name. The CHS initially refused, however, ALEX again offered this "job" to the CHS in or around October 2018. The CHS was promised a monthly stipend and approximately $50,000 to $80,000 for the CHS's participation in the scheme; however, the CHS would be required to return to Cuba after the job was done. Not knowing the full details of the scheme, the CHS agreed, and began opening bank accounts and signing documents at the direction and under the supervision of ALEX, PURO, and CHAMACO.

32.     In October 2018, PURO directed the CHS to travel to Michigan to begin the process of setting up the present scheme, which the CHS did. The CHS returned to Miami, where the CHS was instructed by PURO and CHAMACO to open bank accounts. CHAMACO drove the CHS to and from banks and assisted in opening the accounts. Around this time, the CHS's passport and Alien Registration card were taken from the CHS by ALEX. At different times, the CHS was told

---

[1] The CHS unlawfully entered the United States, but is a lawful permanent resident. The CHS has no known criminal convictions in the United States and is continuing to provide information to the FBI for monetary consideration. The CHS is thus known to law enforcement and can be held accountable for providing false information.

9

that either PROFE or ALEX would retain the identification documents and that the documents would only be brought to the CHS when they were needed to open accounts or businesses or for the CHS to travel in furtherance of the scheme.

33. Then, on or about November 1, 2018, the CHS voluntarily approached law enforcement to report the criminal activity. Shortly thereafter, the CHS traveled to Michigan at the direction of PURO, and with the authorization of law enforcement. This trip lasted approximately three weeks. While the CHS was in Michigan, ALEX traveled to Cuba and dropped in to visit the CHS's family in Cuba, ensuring that the CHS knows that the FMLO is aware of where the CHS's family resides.

34. Also while in Michigan, PURO took the CHS to open bank accounts and sign papers to purchase Care. The CHS, however, does not speak or understand English, so PURO spoke for the CHS while opening the accounts and acquiring Care. Although the accounts and Care were in the CHS's name, the CHS was not intended to be the true owner. Further, the CHS never personally possessed the necessary funds to purchase the business; instead, all of the funds used to purchase the business were provided by PURO, through the FMLO. According to publicly available documents, on or about November 6, 2018, the Care 2018 Annual Report was filed with the Michigan Department of Licensing and Regulatory Affairs. The Annual Report falsely lists the CHS as the President, Treasurer, Secretary, and Director of Care, when in truth and in fact, the CHS held none of those roles.

35. To date, the CHS has conducted more than twelve audio and audio/video recordings of meetings with PURO, ALEX, CHAMACO, and JIMENEZ. These recordings have corroborated the CHS's reporting. In addition, the CHS has consensually recorded many telephone conversations with PURO, ALEX, and CHAMACO. Further, ALEX, PURO, and CHAMACO

10

have all paid the CHS for the CHS's work in furtherance of the FMLO's criminal endeavors. More particularly, the FMLO has consistently paid the CHS a $300 weekly stipend for acting as a nominee owner, as well as paid the CHS $800 per month for the CHS's rent. Since the CHS began cooperating with law enforcement, the CHS has surrendered those funds as evidence in this case.[2]

36.     Law enforcement has identified at least nine corporations in Florida, two corporations in Michigan, and two corporations in Illinois that have been opened in the CHS's name in furtherance of this money laundering scheme. Further, at least eleven corporate accounts and sixteen personal accounts have been identified as having been opened in the CHS's name through at least eleven different banks for the sole purpose of laundering the proceeds of health care fraud and otherwise perpetrating the FMLO's criminal activity. The CHS used none of the CHS's own money to open these accounts; rather, all of the funds used to open each one of these accounts was provided by the FMLO in furtherance of their criminal activity. Similarly, law enforcement has identified at least ten corporations in Florida and three corporations in Illinois that have been opened in JIMENEZ's name. At least ten corporate accounts and twenty personal accounts have been opened in JIMENEZ's name at approximately twelve different banks.

37.     Over the course of the investigation, the CHS discovered various telephone numbers used by members of the FMLO, and reported that the members of the FMLO use multiple phones. Various investigative measures have thus revealed that PURO uses telephone number 248-416-4290 ("PURO's Phone"); ALEX uses telephone number 786-805-7504 ("ALEX's Phone"); CHAMACO uses telephone number 786-281-6125 ("CHAMACO's Phone"). PROFE has used various telephone numbers over the course of the investigation, including: 518-229-3789

---

[2] On one occasion the CHS spent $20 of the funds the FMLO gave to the CHS in order to purchase gas.

("PROFE's First Phone"); 646-238-8959 ("PROFE's Second Phone"); 336-500-4247 ("PROFE's Third Phone"); and 305-336-1117 ("PROFE's Fourth Phone"). In addition, PROFE uses a wireless hot spot with telephone number 786-304-4670 ("PROFE's Hot Spot"). Other members of the FMLO similarly use multiple phones. For example, PANA uses telephone numbers 206-228-5364 ("PANA's First Phone"), and 786-599-6121 ("PANA's Second Phone"); and MICHAEL uses telephone numbers 281-258-6151 ("MICHAEL's First Phone"), and 786-582-1161 ("MICHAEL's Second Phone").

38.     The investigation further revealed, as detailed below, that PROFE, PANA, and MICHAEL use an apartment located at 1950 SW 122nd Avenue, Apartment 518 Miami, Florida (the "Office") in furtherance of their criminal activity. Records furnished by Florida Power and Light revealed that the utilities for the Office are currently being paid by PANA, and that PANA's Second Phone is listed as the contact number for that account.

39.     On March 26, 2019, the Honorable Federico A. Moreno, United States District Court, Southern District of Florida, signed an Order authorizing the interception of wire communications occurring on PROFE's Second Phone, and interceptions began the same day. On or about April 24, 2019, the Honorable Federico A. Moreno, United States District Court, Southern District of Florida, signed an Order authorizing the continued interception of wire communications and interception of electronic communications occurring on PROFE's Second Phone (collectively, the "PROFE Wires"). The period of interception ended on May 23, 2019; thereafter, the intercepted communications were sealed.[3]

---

[3] Only a portion of the pertinent intercepted calls and consensual recordings are discussed herein. The CHS speaks Spanish and does not speak English. All conversations and information provided by the CHS and all recordings involving the CHS referred to herein have been translated from Spanish to English by certified linguists and/or law enforcement officers who speak Spanish. In

40.     The Program Integrity Manager for AdvanceMed, a Medicare contractor, reported that on March 26, 2019, Care submitted its first claims for payment for services purportedly rendered to Medicare beneficiaries. The investigation, however, has shown that that these claims were for services that were never rendered. In fact, when these claims were submitted, Care's only employee was a part time receptionist with no known medical knowledge or training. Thereafter, the FMLO exponentially increased its submission of fraudulent claims to Medicare for services purportedly provided from approximately April of 2018 to approximately April of 2019 that were never rendered. The Program Integrity Manager for AdvanceMed reported that as of May 14, 2019, Medicare had scheduled $9,622,019.26 to be paid as a result of 4,549 RAP claims being submitted on behalf of Care for services that were never provided. Furthermore, on May 9, 2019, Care submitted 13,030 RAP claims in a single day, seeking payment of approximately $27,600,000. The FMLO sought the initial 60% payment but never sought final payment for the home health services. On or about May 13, 2019, a RAP Suppression (stop payment) was entered in the system to ensure that no additional funds would be finalized and paid.

41.     In other words, the FMLO billed Medicare for over $37,000,000 for services that were never rendered. The FMLO received more than $9,000,000 in connection with this scheme and began laundering that money through corporate and personal accounts that were opened in the names of the CHS and JIMENEZ, as further described below, for the sole purpose of perpetrating this money laundering and health care fraud scheme.

**D. DETAILED FACTS SUPPORTING PROBABLE CAUSE**

---

addition, most of the intercepted calls occurred in Spanish and have been translated by certified linguists and/or law enforcement officers who speak Spanish; verbatim portions of intercepted calls that occurred in English are noted herein by italics.

**The FMLO Set up Shell Corporations and Bank Accounts for Fraud Proceeds**

42.     On or about November 29, 2018, the CHS conducted a consensual recording of meetings with PURO and others.  After picking up the CHS, PURO discussed opening bank accounts for the three corporations that are ready and for about six other corporations that PURO was opening.  During the recording, PURO mentioned the names of the following businesses: The Shop Supplies, Inc.; Elite Landscape Design, Inc.; A1 Building and Remodeling, Inc.; Professional Cleaning Services, Inc.; and Green Disposal Services, Inc.  PURO instructed the CHS to call a certain male, provide the names of those companies, and pay for them pretending to be JIMENEZ. The CHS complied.

43.     Based on information retained by the Florida Division of Corporations, The Shop Supplies, Inc; Elite Landscape Designs Inc; A1 Building and Remodeling Inc; and Green Disposal Services Inc were all registered in JIMENEZ's name on or about November 29, 2018.  Professional Cleaning Services I Inc. was registered in JIMENEZ's name on or about December 3, 2018.  All of these corporations list the principal and mailing addresses as 3250 NE 1st Avenue, Suite 305, Miami, Florida 33137.

44.     Later in the day on November 29, 2018, during the consensual recording, PURO told the CHS that the CHS needed to go to Bank of America to open an account for RPG Professional Staffing.  At approximately 3:00 pm, PURO used PURO's Phone to call an individual he referred to as "Mari."  The investigation has shown that Mari handles the initial corporate documentation and other relevant paperwork for setting up shell companies used to launder the proceeds of the health care fraud.  During the call, PURO requested that Mari open the following corporations: RPG Network Management, Inc., RPG Maintenance Services, Inc., Gables Industrial Cleaning, Inc., AI Office and Building Supplies, Inc., Excel Consulting Group, Inc., and Elite

14

Catering & Event Services Planning, Inc., all of which should use "Suite 109" under the CHS's name in Florida. PURO requested that if any of those names were already taken, that the name be changed.

45.      Records maintained by the Florida Division of Corporations revealed that the following corporations were registered in the CHS's name: RPG Industrial Service Supply Inc, RPG Marketing Inc, and RPG Professional Staff Inc on November 27, 2018; A1 Office and Building Supply Inc, Excel Consulting Group Inc, Gables Industrial Cleaning Inc, RPG Maintenance Services Inc, and RPG Network Management Inc on November 29, 2018; and Elite Catering & Events Services Planning Inc on November 30, 2018.

46.      On or about November 29, 2018, at approximately 10:58 pm, the CHS called ALEX on ALEX's Phone. During the call, the CHS updated ALEX regarding what the CHS did that day, explaining that the CHS took care of the lease and paid it with a check; opened a business account at Bank of America for one of the companies that was opened "here" meaning in Florida; and opened three companies and a business account for one of those companies. ALEX responded that they later must open a business account for all of the companies. The CHS stated that the following morning, the CHS would be taken to open other accounts and ALEX stated that they should open several accounts. ALEX and the CHS further discussed that the CHS should not worry about when they will be working. ALEX and the CHS agreed to meet the following day when the CHS was done opening accounts.

47.      On or about November 30, 2018, the CHS conducted a consensual recording of meetings with CHAMACO, and others. On this date, CHAMACO informed the CHS that they needed to go to a Citibank located in Hollywood, Florida to open bank accounts, just like they did the day before, but for a different company. CHAMACO specified that the accounts would be for

15

a supply company involved in the distribution in bulk of things like band aids and needles. CHAMACO also told the CHS to explain that he (CHAMACO) is the son of the CHS's best friend and that CHAMACO is assisting the CHS because CHAMACO speaks English. CHAMACO also indicated that they would need to go to a TD Bank to open additional accounts.

48.     While waiting for a bank representative, CHAMACO explained that his job is to find people and prepare them to do what the CHS was then doing. CHAMACO does exactly what "they" tell him; if "they" instruct him to go to a specific bank and open a number of accounts, that is exactly what he (CHAMACO) does. CHAMACO further explained that he gets paid by PURO, and prefers to deal with as few people as possible. When the CHS stated that the CHS knew they were stealing from Medicaid, CHAMACO explained that it is not stealing from Medicaid, but rather money laundering. CHAMACO further explained that companies get funds from other business transactions and they do this to avoid paying thousands of dollars in taxes, so basically it is a way of justifying the funds. CHAMACO further mentioned that some of the companies are involved in the stock market or investment firms and the companies deposit their funds in these accounts so that they are able to withdraw funds later. CHAMACO said that this is not about stealing from anyone because the money is the same and it belongs to the same people. The CHS responded that in this case it belongs to PROFE, and CHAMACO confirmed it belongs to him (PROFE) and others, but he (PROFE) is the one who directs it.

49.     When the bank representative assisted the CHS, the CHS opened a business account for RPG Industrial Service Supplies, located in Coral Gables, and gave PURO's Phone as the contact number. After some time, the bank representative confirmed that the application for the business account was sent, and CHAMACO and the CHS agreed to return to the bank to open a savings account once the account was approved.

50.     On or about December 3, 2018, the CHS conducted a consensual recording of meetings with CHAMACO, and others. On this date, CHAMACO explained that CHAMACO and the CHS would open an account at TD Bank, just as they previously did at Citibank. CHAMACO further indicated that they would pick up corporation papers from JIMENEZ. CHAMACO stated that he (CHAMACO) would go inside to get the papers, suggesting that the CHS was not allowed to meet JIMENEZ. When CHAMACO and the CHS arrived at the location where CHAMACO indicated that he would pick up corporate documents, the CHS was told to wait outside, which the CHS did.

51.     At the bank, while the CHS was opening an account, CHAMACO provided PURO's Phone as the contact number for the account. CHAMACO then gave the CHS $100 to open a personal account, which the CHS did. When the bank representative attempted to help CHAMACO and the CHS set up an online account, the bank representative sent a temporary password to the phone number on the account; as such, the temporary password was sent to PURO's Phone, which CHAMACO and the CHS did not possess at that time. CHAMACO indicated that they would set up the account later.

52.     On or about December 4, 2018, the CHS conducted a consensual recording of meetings with PURO, and others. On this day, PURO explained that they would open accounts at Regions and SunTrust, and later see if any of the corporations were ready. PURO then gave the CHS the CHS's residency card, $100 to open the Regions account, and $100 to open the SunTrust account. PURO further instructed that if the CHS needed to put money in the savings accounts and not just the personal checking accounts, then the CHS could deposit $25 in those accounts. PURO further explained that six more corporations were still pending in Miami, and that it should take another week before they were complete.

17

53.      PURO explained to the CHS that they would have to travel to Michigan and Chicago again to pick up some corporations and see if PROFE wanted them to open two additional accounts in Chicago. PURO further explained that after the CHS traveled to Cuba for New Year's, the CHS would not travel back to Cuba before everything was completed and the CHS would be moving there "for good." PURO indicated that they would continue once the money started to flow until PROFE told him it was over. PURO further explained that JIMENEZ would stay in the United States a little longer than the CHS because the money will be transferred from the CHS's account to JIMENEZ's account, and then will be withdrawn from there.

54.      PURO further advised the CHS that they already had accounts at Bank of America, Chase, and PNC, and that they needed to go to Regions and SunTrust. PURO then opted to go pick up the corporate documents before continuing to another bank. When they arrived, the CHS went inside the location alone and picked up documents for both the CHS and JIMENEZ, then returned to the vehicle where PURO was waiting. PURO reviewed the documents and sent the CHS back inside to get one of the documents fixed; the address erroneously listed the suite as 105 instead of 109. The CHS complied, and returned to PURO's car.

55.      PURO then took the CHS to SunTrust, where PURO directed the CHS to go in alone and open the checking and savings accounts. While the CHS was inside the bank, PURO called the CHS and instructed the CHS to tell the teller that the business documents are now ready, so the CHS wanted to open a corporate account, too. The CHS provided PURO's Phone as the contact number. PURO then entered the bank and delivered the corporate documents, posing as the CHS's assistant. The manager then began assisting in opening the corporate account. During this process, the manager asked many questions. PURO answered many of her questions instead of the CHS, who was purportedly the owner of the company. Eventually, the bank agreed to open

18

the accounts and PURO requested that the checks start at number 4,000.

56.     After leaving the bank, PURO explained that he was teaching CHAMACO how to do what PURO does and indicated that he (PURO) is not telling PROFE about CHAMACO's involvement. PURO further explained that it is necessary to be prepared for when the money starts coming in, and that he has experience from doing this for many years.

57.     Before dropping off the CHS, PURO requested that the CHS return the CHS's residency card because PURO wanted to have it handy if PROFE asked where it was. The CHS complied and returned the CHS's residency card to PURO.

58.     On or about December 5, 2018, the CHS conducted a consensual recording of meetings with PURO, and others. On this date, when the CHS asked PURO if they would need to return to Chicago and Michigan once things take off, PURO confirmed that they would work in Miami, Chicago and Michigan, adding that they would have to make deposits, withdraw money and move it in between accounts.

59.     During the recording, PURO and the CHS met CHAMACO and JIMENEZ and JIMENEZ was introduced to the CHS. JIMENEZ stated that he has been in the United States for 21 years and could not wait to leave. During the group's conversations, CHAMACO indicated that he had created some corporations the prior day and that the process gets easier every time. CHAMACO asked PURO if he could go to a BB&T Bank that day, to which PURO responded that CHAMACO should go to the one he visited the other day.

60.     After PURO and the CHS left, PURO received a call from "Mari" indicating that the corporations' incorporation documentation was ready to pick up. PURO then explained to the CHS that he had requested that Mari create more than twenty corporations recently, paying $550 for the ones "up there" and $165 for the ones in Miami. PURO and the CHS then met with Mari.

19

PURO asked Mari what changes she made. She explained that she added the number one in roman numerals after the last word in the company name. PURO then read "*Professional Cleaning Service I, Inc.*" aloud. PURO stated that they were still missing two corporations for the CHS, plus three for JIMENEZ. PURO then asked her to check the list that he gave her and call him back, to which Mari agreed. PURO further explained that he needed three additional corporations under JIMENEZ's name to use in Chicago. Mari thanked PURO, and they exchanged goodbyes.

61.     After the CHS and PURO left, PURO told the CHS about a "business owner" just like the CHS. This individual purportedly had to leave the country because there was a warrant out for his arrest. PURO explained that the case appeared in the news and he (PURO) had to help this person escape the United States through Michigan and into Canada.

62.     On or about December 18, 2018, the CHS conducted a consensual recording of a meeting with ALEX. On this date, at approximately 6:31 pm, ALEX's Phone called the CHS. This call was recorded. The CHS asked if ALEX was outside and ALEX affirmed. The CHS then went outside and entered ALEX's car and attempted to turn on a light, but ALEX refused. During the meeting, the CHS asked ALEX how everything was going. ALEX replied that the CHS knew more than him, and added that everything is ready and they will start by the end of January. ALEX indicated that a few details were still outstanding and confirmed that ALEX and the CHS would work together in the future.

**Importance of Aliases and Identity Concealment to the FMLO**

63.     Also during the recorded meeting, ALEX explained that his partner, PROFE, is edgy because the CHS calls ALEX by his real name. The CHS responded that the CHS knows ALEX, but that the CHS will call ALEX "Socio." ALEX indicated that it is always best not to leave a trail and they agreed that in their business it is important to always watch one's identity.

20

ALEX commented that in that respect, he (ALEX) is more daring and "those" people are more careful. The CHS stated that at some point, they are the ones showing face, not PROFE, and that is what PROFE gets for being the one who puts down the money. ALEX advised that in phone conversations it is important not to talk nonsense, and adds that if there's more to discuss, one should say, "Easy. I'll see you later."

**Plans for the FMLO to Ensure the CHS's Departure to Cuba at the Conclusion of the Scheme**

64.     After further conversation, ALEX paid the CHS $1,000. The CHS asked if the money had anything to do with the weekly money, to which ALEX replied that he will give the CHS that money when the CHS returned from Cuba and that ALEX would give the CHS the money for the rent sometime the following day. The CHS counted the money and confirmed it was $1,000. ALEX confirmed that he would take the CHS to the airport for the CHS's flight to Cuba and that ALEX would give the CHS the CHS's passport and residency card at that time. The CHS and ALEX agreed that their business is serious and well-structured, otherwise it would not have lasted so many years. When the CHS mentioned ALEX's boss, ALEX replied that he does not have a boss; he has a partner.

65.     The CHS advised law enforcement that the FMLO was paying for the CHS to travel to Cuba over the holidays. The CHS explained that ALEX told the CHS that this trip was meant for the CHS to begin taking personal belongings back to Cuba so that when the CHS would be required to leave permanently, the CHS would not need to pack many items so that law enforcement would not believe that the CHS was moving, but rather taking an ordinary trip. Based on the CHS's conversations with ALEX and PURO, the CHS also believed that PROFE and ALEX would both be traveling internationally for the holidays. The CHS also advised that PURO would likely be meeting with PROFE soon in order to obtain money in advance of the holidays.

21

According to information provided by the CHS, PURO often met with PROFE inside PROFE's vehicle at PURO's residence, which was later identified as 13027 SW 50th Street, Miami, Florida ("PURO's Residence").

**PROFE's Use of Multiple Phones**

66.     On or about December 21, 2018, surveillance was conducted in the vicinity of PURO's Residence. At approximately 1:12 pm, call records revealed that PROFE's First Phone called PURO's Phone and the conversation lasted approximately 10 seconds. Location information associated with that call revealed that PROFE's First Phone was pinging off a tower located in the vicinity of SW 135th Avenue, between SW 56th Street and SW 59th Street, in Miami, Florida. This location is approximately between 15575 SW 54th Street, Miami, Florida ("PROFE's residence") and PURO's Residence. At approximately 1:14 pm, PURO was observed entering the passenger side of a white Cadillac Escalade, bearing Florida tag GCTN44, which had parked in PURO's driveway. PURO entered the Escalade carrying a white plastic bag and exited approximately twenty minutes later carrying a small black pouch. The Escalade departed the area and was lost in traffic.

67.     Travel records revealed that PROFE flew to London on or about December 26, 2018 and returned to Miami International Airport on January 4, 2019 with a female with the initials "J.A." and other members of his family. On January 4, 2019, PROFE was submitted to a secondary inspection where he stated that he had traveled to Spain and London for a nine-day vacation with his family. PROFE was in possession of one phone: an Apple iPhone (PROFE's Fourth Phone). On that date, law enforcement confirmed that the Escalade was parked at the airport. When the secondary inspection was completed, law enforcement observed PROFE go through Customs, exit the airport terminal, enter the Escalade, and depart the airport with his family.

22

68.     From November 2018 through the beginning of January 2019, PURO's Phone and ALEX's Phone were both in communication with PROFE's First Phone. After PROFE was submitted to secondary inspection, PURO's Phone and ALEX's Phone began contact with PROFE's Second Phone, and have continued communicating with PROFE on PROFE's Second Phone since that time.

## Implicit Threats to the CHS's Family

69.     On or about January 18, 2019, the CHS conducted consensual recordings of meetings with PURO, and others, in Michigan. During the recording, the CHS provided the CHS's Florida Driver License to PURO for PURO to keep. PURO provided the CHS with a projected itinerary for the CHS's time in Michigan and Chicago and indicated that they would do whatever PROFE told them to do. PURO further stated that PURO and the CHS had an appointment for later that day to sign a lease for the office where Care was located. When the CHS asked how long "this" would last — three months or four months, PURO indicated that it would last longer than that, but that the CHS would be the first to depart. PURO further explained that the female who was hired to work at Care was not aware of what was occurring. PURO further stated that ALEX and PANA have been involved in this for a while. When the CHS inquired about PANA's role, PURO responded that PANA would get money, but did not indicate that PANA had any specific role. During the recording, PURO also stated that when people come to the United States from Cuba, PURO has a house where they stay. PURO further stated that if PURO told them to go to Cuba the following day, they would go. PURO also stated that CHAMACO has already been to everyone's home, so if anyone betrays someone, it can be taken care of. The CHS asked if that is why ALEX went to the CHS's home in Cuba, to see where they live if the deal goes bad. PURO responded, "Of course." PURO confirmed that they have everything of everyone and that

23

CHAMACO went to the CHS's house in Cuba.

**Care is a facade.**

70.     On or about January 18, 2019, PURO and the CHS traveled to a Fifth Third Bank, where PURO inquired about checks and the balance of the business account for RPG Industrial Service Supply.  Thereafter, PURO and the CHS traveled to the location of Care.  The CHS asked PURO if PROFE or PURO were going to treat the people.  PURO stated that they would just sit in the office.  When the CHS asked if this is a facade, PURO responded, "Of course.  Nothing intelligent.  The smart one is El PROFE."  When the CHS asked if JIMENEZ had another office, PURO responded that JIMENEZ has nothing to do with this, it is another matter.

**Profe Exchanges Vehicles.**

71.     : On or about the morning of January 28, 2019, law enforcement drove past PROFE's Residence and discovered a black Audi sedan parked in the driveway, bearing Florida tag GCTN44.  Records maintained in Florida's DAVID system revealed that PROFE registered a 2019 black Audi sedan on or about January 26, 2019 with the same Florida tag that had previously been registered to the Escalade in PROFE's name.

**Structure of the Money Laundering Scheme**

72.     On or about February 5, 2019, the CHS again traveled to Michigan at the direction of the FMLO.  On that day, the CHS conducted consensual recordings of in-person meetings with PURO, and others at the direction of law enforcement.  During the first recording, the CHS gave PURO cash that CHAMACO had given to the CHS to pay for the hotel room.  PURO indicated that the CHS had state-issued identification documents for Miami, Chicago, and Michigan, respectively, and that the CHS would work in all of those locations.  PURO further confirmed that they were at the point that the business would begin.  PURO also explained that during certain

24

days of the week, the CHS would go to a place where PROFE tells the CHS to go; there, the CHS will get a cashier's check, put the CHS's information in, and either the CHS or "he" will sign. PURO stated that he does not know what ALEX will do, but that ALEX will be with the CHS in Miami. When the CHS asked if more than millions of dollars had been withdrawn, PURO confirmed. In response to the CHS's questions regarding PROFE and PANA, PURO confirmed that PROFE and PANA are friends and that they have worked together for more than fifteen years.

73.     During the recording, PURO and the CHS discussed a female receptionist who was hired to work at Care. During this conversation, PURO confirmed that the receptionist who was hired to work at Care during the day does not know anything about the scheme, but that she is there for presence and that PURO gets the phone calls from the business. PURO and the CHS later went into a Fifth Third Bank in Michigan. There, PURO made a deposit and asked for the balance of the account. After leaving the bank, PURO stated that they could get $3 million, $5 million, $8 million, $10 million, $13 million, or $15 million from the business. PURO then told the CHS that every time the CHS enters a bank, the CHS should ask for the balance.

74.     PURO further stated that ALEX is a soldier like him (PURO) and the CHS, while PROFE and PANA are the bosses. PURO stated that all of the jobs are prepared very well and that he only wants a piece of the "apple." PURO stated that ALEX will pay the CHS and PURO will pay JIMENEZ. PURO further stated that ALEX has been in this job for fifteen years. PURO stated that ALEX knows where the people are and that ALEX will monitor the people who are sent to Cuba. PURO further stated that PURO does not go to Cuba, but rather will send CHAMACO to make sure that the individuals involved in the scheme are in Cuba. PURO then stated that PANA is friends with ALEX, is Cuban and that PANA has money, but that he does not dress in expensive clothing.

25

75.     During the recording, PURO told the CHS about when he (PURO) started working with PROFE.  PURO stated that initially, he (PURO) worked with two individuals.  PURO indicated that one of those individuals did not know how much money was in the accounts.  PURO further indicated that this is the first time PURO worked with PROFE directly.

## Fraudulent Billing, Receipt of Health Care Fraud Proceeds, and Beginning the Next Fraudulent HHA

76.     On or about April 2, 2019, at approximately 4:27 pm, PROFE's Second Phone received a call from PANA's First Phone; the conversation lasted approximately 9 minutes and 7 seconds.  During the call, PANA handed the phone to MICHAEL.  When MICHAEL got on the phone, he stated, "*My n***** . . . Pop open a bottle of champagne, mothaf****.*"  MICHAEL went on to state that they were paid in seven days, exactly, and confirmed, "$7,160.89."  MICHAEL further explained, "We'll have 7,000 in the bank, we should have it in there between tomorrow or the next day."  MICHAEL additionally stated, "I submitted for 3/26, I submitted for 3/28 — and then I submitted the one for 3 — Seventy six thousand.  *So,* which means that by 4/7 around then, we'll be waiting for another bunch a bit more [UI]."  PROFE responded, "Nah, throw him curve balls and straight ones every day. The hell with it."  MICHAEL stated, "Right, right. [UI].  I'm going to send another one of those.  There was one for 2/15 there with some codes that had been changed from the last time that we were billing, some CPT codes that were suspended and they were changed for other ones that I had received in Home [PH].  I've got them now *and now you know, it's moving back like clockwork.*  And any other little thing that might come up, *I'll call you* while it's happening. No, well, *but we are on the ball.  That's the important thing, we're on the ball, mother f******.*"

77.     During this call, MICHAEL accurately identified that Medicare paid $7,160.89 in

connection with the initial RAP claims that were submitted. MICHAEL went on to accurately describe the dates on which the FMLO fraudulently billed Medicare for services that were never rendered. Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that when MICHAEL indicated that "some codes" had changed, he was referring to the three initial claims that were denied for the administrative reason of having an improper billing code. However, after those three claims were resubmitted with updated billing codes, the claims were accepted and paid.

78. Also during the call, PROFE asked, "*I got a, I got a, you got the* thing [device] that I sent you of the new thing, right?" MICHAEL confirmed, "Yes, yes, yes. *I got it.*" PROFE said, "*If you get a chance* uh, I'm going to send you, well, it's that I can't text it through here." PROFE said, "*I have a new phone*, but *I, I would I have the phone to contact the, the, the seller.* So *what I was going to do is put you or introduce you as a, as a, as a consultant or as a, you know, an advisor kinda thing in, in the next one. To kinda like probably hopefully get it done, over and done this month before the month ends. . . .* So when the steam on this one runs out and as much as we would like for it not to, it will run out *by the end of May* because of that *cost report. In June actually. . . . Sometime in June that shit stops.*"

79. Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that when PROFE referenced having a new phone to use in connection with the "next one," PROFE was indicating that he uses new phones in connection with each new health care fraud scheme that the FMLO perpetrates. I believe that PROFE indicated that he is in communication with the seller of the next HHA that the FMLO will use to fraudulently bill Medicare and that PROFE plans to introduce MICHAEL to the seller as a consultant or advisor. PROFE further indicated a desire to have the

27

next scheme ready to begin fraudulently billing by the time the FMLO must shut down the fraud scheme related to Care. This follows the FMLO's business model as further described below: shortly after receiving the proceeds of health care fraud related to an ongoing scheme, the FMLO uses those funds to purchase a new HHA and begins opening new accounts with cash for additional nominees to initiate the subsequent fraud scheme. Furthermore, I believe that PROFE's reference at the beginning of the call to the "device" that PROFE had acquired for MICHAEL was a wireless hot spot, which MICHAEL was intended to use in furtherance of the FMLO's criminal activities.

80.     Later in the same call, PROFE told MICHAEL they will ask the person to order three "licenses" (suggesting occupational licenses) and to go there so he can check the mail every day. MICHAEL suggested that the key to the place be changed, because currently the attorney has the key. PROFE indicated that he would ask to have all that done.

81.     On or about April 2, 2019, at approximately 4:37 pm, PROFE's Second Phone called PURO's Phone; the conversation lasted approximately 4 minutes and 41 seconds. During the call, PROFE told PURO that the payment for the first seven claims would come within two days and that the rain of flowers starts. PROFE further told PURO that the CHS needs to get two or three licenses while the CHS is "here," and then the CHS must go "up" because the CHS must pick up the mail every day. PROFE further directed PURO to get a locksmith to change the lock at the office because the attorney still had access. PROFE additionally directed PURO to clean the place so that his (PURO's) hands, meaning his fingerprints, are not shown there. PROFE indicated that when the CHS gets a particular item in the mail, they will know how long they have.

**PURO and PROFE Direct Evidence Tampering and Plan the New HHA**

82.     On or about April 4, 2019, at approximately 1:15 pm, PROFE's Second Phone called PURO's Phone; the conversation lasted approximately 7 minutes and 8 seconds. During

28

the call, PROFE told PURO that he (PURO) should be "there" this weekend, so "you can do that because you know if you've touched anything there." PURO indicated that he would leave the following night and return Monday or Tuesday. PROFE agreed with that plan. Later in the call, PROFE told PURO he (PURO) must go to the office to clean up his "fingers," meaning his fingerprints. PROFE instructed PURO to purchase alcohol because it takes out finger grease, and suggests that PURO do the bathroom, the toilet, and wherever else he may have gone. PURO affirmed, and PROFE suggested that PURO have the CHS touch everything after PURO cleaned it.

83.     Based on reporting by the CHS, PURO in fact traveled to Michigan and wiped the Care office clean on or about Sunday, April 7, 2019. After wiping away fingerprints, as PROFE suggested, PURO had the CHS touch items in the office in order to ensure that the CHS's fingerprints would be found if law enforcement tested the office for prints.

84.     During the call, PROFE additionally indicated that he (PROFE) would attempt to communicate with the seller by Monday at the latest. PROFE indicated that PURO could return Wednesday at the latest, and if he (PURO) had to return, it would be for the new thing, or when they begin the Chicago thing. Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that during this portion of the call, PROFE indicated that PURO may be needed to participate in a new "thing," or scheme, which may involve a location in Chicago.

**Acquiring "Occupational Licenses"**

85.     On or about April 4, 2019, the CHS conducted a consensually recorded meeting with PURO, and others. During the recording, PURO took the CHS to a location in Miami to pay a business license tax, which was formerly called an "occupational license," for approximately six

29

corporations that were opened in the CHS's name.

**Opening and Managing Bank Accounts across 10 Different Banks in the Nominees' Names**

86.     On or about April 8, 2019, at approximately 12:51 pm, PROFE's Second Phone called PURO's phone. The call lasted approximately 13 minutes. In the call, PROFE and PURO discuss the status of the various accounts opened in the CHS's name, including at Bank of America, Chase, and SunTrust. PROFE also told PURO that he will need personal checks for JIMENEZ from Bank of America, Bank United, Chase, Citibank, U.S. Bank, Wells Fargo, BB&T, Fifth Third, and TCF Bank. PROFE reiterated that these accounts were all in JIMENEZ's name. PROFE also wanted business checks in JIMENEZ's name from the Chase account ending in 1275, Citi, and Wells Fargo. PROFE said that including the accounts in the CHS's name, the total number of accounts is 15. PROFE added that he would have someone take money from the Chase account and deposit that into the CHS account for which PURO has the checks.

**Billing and Laundering Millions of Dollars in Fraud Proceeds and Planning the New HHA**

87.     On or about April 8, 2019, at approximately 6:05 pm, PANA's First Phone called PROFE's Second Phone; the conversation lasted approximately 15 minutes and 15 seconds. During the call, PANA gave the phone to MICHAEL. During PROFE's conversation with MICHAEL, they discussed how long the FMLO would have to fraudulently bill Medicare in association with Care. MICHAEL stated that in the next 21 days, they need to go ahead and aggressively move forward and that by the end of April, their target was to have five "melons." MICHAEL went on to state that he has everything planned and in order, and that he is ordering the rest of the items, like the withdrawal stamps and the deposit stamps, and they should be in by the following week. PROFE stated that he had the people up there in position. Later in the conversation, MICHAEL inquired about the "new one" or the replacement company. PROFE

30

responded that he is working on it. MICHAEL and PROFE agreed that PROFE will get MICHAEL a new phone and MICHAEL agreed that a Samsung was ok; it does not need to be an iPhone. Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that during this call, MICHAEL indicated his belief that the FMLO would only be able fraudulently bill Medicare in connection with Care for a limited amount of time, so he planned to do so aggressively. I believe that when MICHAEL indicated his target was five "melons," he was indicating his hope to receive $5 million in health care fraud proceeds. I further believe that the FMLO is already in the planning stages to set up yet another scheme with a "new one," meaning a new HHA; however, the FMLO will use new, unknown phones in connection with the new scheme in an effort to thwart law enforcement investigations.

88.     On or about April 9, 2019, the CHS conducted a consensual recording with PURO, and others. During the recording, PURO described for the CHS how the FMLO would launder the proceeds of health care fraud, explaining, "So, once all your accounts are full of money, then it will be put into El Madurito's other accounts," meaning JIMENEZ's accounts. PURO continued, "That's why I've given you so many accounts. You have fourteen accounts." PURO continued:

> You know what I'm saying? Fourteen Business accounts, fourteen Personal, and fourteen Savings. He distributes them on the computer, or he'd tell me to deposit them because it looks better if you make the first deposits, you understand? Then we go to Chicago, we go to Michigan; that's why you have licenses from Chicago, Michigan and other places because you're going to get to Chicago with your Chicago license. And you're going to go to PNC—uh, uh, uh… what's it called? To any bank in Chicago, you have several, [coughs] and you'll withdraw and you will—you will get all those things done, do you follow me?

31

**PURO addresses the illegality of the FMLO's conduct and its liability for dollars billed to (as opposed to dollars received) Medicare.**

89.     PURO further explained that the CHS must return to Cuba when the scheme is over.

PURO indicated that once the fraud is discovered, an inspection with Medicare will occur and they

will discover that Care was sold to the CHS before the fraudulent activities began and that all of

the money was deposited into the CHS's accounts. PURO explained, "First they're going to check

all your addresses. All of your addresses, the one here in Michigan, the one in Miami, all of your

addresses, they are going to go there first. When they see that those don't exists, then they start

going deeper." According to PURO, "They start checking your credit cards to see the movements,

this and that. That's how they work." PURO later explained:

> They don't work like [Banging noise] they — the people — these people don't —
> these people don't work like that. These people take their time. Now when they
> see, for example, that they request — Medicare requests — they send a letter stating
> [UI] the money to be returned but this was like this, la, la, la, la — there is no
> response, so then, they pass it on to the — to the — to the three letters, you follow?

90.     When the CHS asked, "But which three letters?" PURO responded:

PURO:     The FBI, buddy. Yes, this is federal, this isn't... this is federal, and it's
          bigger. Then the feds come and start looking at the case, pam, pam, pam,
          and they start to put all the pieces together [Mumbling] and then that's
          it.

CHS:      [UI] because of what you say, I — I'm in prison in Cuba, I can't go
          anywhere. [Laughs]

PURO:     INTERPOL.

CHS:      Yes.

PURO:     You can leave Cuba and you can come back here. It could be that you
          come, stay here for a year, it may be that nothing ever happens to you.
          But the day something does happen, they are going to hit you with quite
          a few years.

CHS:      Yeah, the ones they catch with this, they will hit us with a lot of years,
          right?

PURO:     Profe, eh — just realize that — you tell me — remember that — they
          don't lock you up for what you take out, they lock you up for what you
          billed. Normally you bill — if you withdraw two million then ten were
          billed. They're going to get you for ten. If they withdrew ten million

they billed 30 million.  They bill — because when you bill — billing means, when you send Medicare a *claim*, right?  They pay you uh — for example you — you billed 100 — $100 pesos.  They pay you maybe $50 or $60 dollars out of those $100 pesos.  But they — but — but they punish you for the $100 that you billed.  Because that was your intention, to steal $100, not to steal only $60.

CHS:    It's… this is tricky.

PURO:   You have eh… [UI] you have a big pile of [UI].  There is Medicare fraud, eh… money laundering… a few cases.  And even with plenty of [UI].

**Obtaining the CHS's Signature and Discussion of Check Cashing Stores**

91.     On or about April 12, 2019, at approximately 1:05 pm, PROFE's Second Phone called PURO's Phone; the conversation lasted approximately 3 minutes and 24 seconds.  During the call, PROFE instructed PURO to bring deposit slips from the banks, but to make sure not to touch the paper.  Rather, PROFE instructed PURO to put the slips in an envelope, noting which banks' slips are inside.  PROFE also told PURO that he (PROFE) needed the CHS to get a piece of paper and to send them the CHS's signature, meaning the way the CHS signed at Chase Bank.  PROFE further instructed PURO not to send the signature to PROFE, but rather to send it via WhatsApp to the "Loquito" so that he can start preparing the first deposits as twenty-five had already arrived.  The CHS reported that PURO instructed the CHS to write the CHS's signature several times on a piece of paper.  PURO then mailed the paper with the CHS's signature to PROFE.

92.     On or about April 12, 2019, at approximately 4:27 pm, PROFE's Second Phone called PURO's Phone; the conversation lasted approximately 57 seconds.  During the call, PURO stated that "this guy" needed to get WhatsApp so that he (PURO) could send the signature.  PROFE then instructed PURO to send the signature in the mail via priority no matter how much it cost.

93.     On or about April 16, 2019, at approximately 6:17 pm, PROFE's Second Phone received a call from PANA's First Phone; the conversation lasted approximately 7 minutes and 56

33

seconds. During the call, PANA gave the phone to MICHAEL. PROFE informed MICHAEL that he (PROFE) left MICHAEL a page with a bunch of signatures. MICHAEL indicated that he saw it. MICHAEL and PROFE agreed that the checks must be "computerized," and not handwritten. PROFE and MICHAEL then discussed doing "wires" and PROFE clarified that he has "another guy" to go through. PROFE explained that it would be like the last thing they took out of "Tri," when they took out two-something. PROFE indicated that his plan is to fill up the ones "up there" and then when those are ready, they can start writing "down here." MICHAEL confirmed that they have some in the bank already and that by the end of the week, they should be up to "one." PROFE confirmed they are with the "cantaloupes." MICHAEL agreed that they are taking it right out of their noses.

94.     During this call, MICHAEL accurately indicated that by the end of the week of April 16, 2019, the FMLO obtained over $1,000,000 in proceeds of health care fraud. During other intercepted calls, the FMLO has referred to millions as "melons," and "cantaloupes." The investigation further revealed that the FMLO continuously used what appeared to be an exact copy of one of the signatures that the CHS provided to PURO, which was then provided to PROFE, and finally, to MICHAEL. Bank records revealed that a hand-written check was written from a JP Morgan Chase corporate account for Tri-County Homecare, LLC to a shell company titled VMR Ventures LLC for approximately $286,475; the check purported to be written on April 5, 2018 and posted on April 13, 2018. Tri-County received over $7 million in deposits from Medicare for services that were never rendered through on or about March 28, 2018. As such, this "two-something" transfer was made "toward the end" of when the operating accounts received the proceeds of health care fraud in "Tri"-County.

**Counter-Surveillance Measures and the FMLO Members' Use of Multiple Vehicles**

95.     On or about April 15, 2019, at approximately 2:04 pm, PROFE's Second Phone called PANA's First Phone; the conversation lasted approximately 13 minutes and 30 seconds. During the call, PANA asked if PROFE was driving his (PANA's) vehicle. PROFE affirmed. PROFE later explained that he sometimes meets him "there" and sometimes at the mall, where PROFE buys himself something. PROFE further stated that he has even met people at the beach. PANA indicated that it is good that PROFE watches out for himself. PROFE responded that he will never get caught. PANA and PROFE discussed exchanging cars so that people do not see them going in and out and PROFE indicated that "black neighborhoods" are the best to work because no one is there. PANA further indicated that his (PANA's) vehicle is a "Chrysler." Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that during this call, PROFE and PANA discussed their efforts to evade law enforcement surveillance. I believe that PROFE indicated that he meets people in furtherance of his criminal activities in a variety of places, including the beach, the mall, and "black neighborhoods." I further believe that he indicated he attempts to further evade law enforcement by changing vehicles, including trading vehicles with PANA.

**Initial Identification of JC**

96.     On or about April 17, 2019, law enforcement was conducting surveillance in the vicinity of JC's Residence. On that day, law enforcement received location information associated with JC's Phone. At approximately 1:03 pm, location information revealed that JC's Phone was in the vicinity of a parking lot of a Home Depot located at 11305 SW 40 Street, Miami. At that time, law enforcement observed a silver, Honda Pilot bearing Florida license plate SAQ70. Law enforcement observed the vehicle drive from the Home Depot to the residence located 1217 SW 117 Court, Miami, Florida ("JC's Residence"). Thereafter, location information associated with

35

JC's Phone has consistently indicated that JC's Phone is located at JC's Residence throughout the night during normal sleeping hours.

**Intercepted Calls Regarding Money Laundering Activities and Hiding Assets**

97.     On or about April 17, 2019, PROFE's Second Phone called PURO's Phone; the call lasted approximately 16 minutes and 24 seconds. During the call, PROFE told PURO that he (PROFE) was on the way, and went on to describe the items that he (PROFE) was delivering. PROFE described an envelope with all of the deposit slips that were ready, as well as an envelope that is not ready because he did not receive the stuff on time. PROFE directed PURO to ensure that he (PURO) put gloves on, especially when the CHS filled them out and signed them. PROFE further stated that every place PURO needed to go was clearly printed outside the envelope with the bank account and the amount. PROFE instructed that PURO would need to go to TCF and the new place where they just opened the bank account the day before, which is where he would deposit the "519," meaning the $519,000. PURO agreed to do that the following day. PURO and PROFE went on to discuss having the CHS and JIMENEZ go "up there" and "down here" to continue making deposits and doing the "little papers." PROFE further instructed PURO that he (PURO) would personally be responsible for the "older" man. PURO responded that he (PURO) already had eleven accounts open for that new nominee owner, including cards and checkbooks, and later added that he had eleven personal accounts, ten business accounts, and eleven savings accounts. When PURO offered to give the cards and checkbooks to PROFE, PROFE declined, instructing PURO to take charge of that one. PROFE further indicated that he (PROFE) would need PURO to take "him" to the place in Hialeah once per week to do the little papers and leave them there. PROFE inquired about the new nominee owner and PURO described him as between 35 and 40 years old, with good credit, and lives a quiet life in an apartment in the middle of

36

nowhere. PURO further indicated that yet another nominee owner is named "Silvestre," but that he has only three accounts. PURO specified that he (Silvestre) is the one for whom PROFE paid for the passport five or six months before. PROFE responded that if he (PROFE) needs someone quickly, he would prefer to use Silvestre and then send him "over there," suggesting Cuba. PROFE later advised PURO that the following month, they would pay the utilities for the "Chi" location so that the accounts would show movement of money for expenses instead of just from one account to the other.

98.     During the call, PROFE advised PURO that if everything that was scheduled to come in was paid, they should be at 10 or 11 million. PROFE then instructed PURO on how to hide his portion of the money. PROFE explained that this month PURO could deposit about $6,000 in both his father's and brother's accounts, for a total of $18,000 between three accounts. PROFE explained that when PURO least expected it, he (PURO) would have enough to buy a house in cash. PROFE instructed PURO to place the house under PURO's name or under his daughter's name because no one can do anything with that, meaning that law enforcement would be unable to seize the home if it were purchased in cash in a family member's name. PURO reiterated that PROFE would have to teach PURO how to do this.

**April 23, 2019 Surveillance and Intercepted Calls**

99.     On or about April 23, 2019, law enforcement observed PROFE driving a black Chrysler 300 bearing Florida transporter plate G7827J. On that day, intercepted calls revealed that PROFE planned to meet PURO in furtherance of their fraud scheme. Law enforcement observed that meeting occur at approximately 11:50 am in PURO's vehicle; however after PROFE left the meeting in the Chrysler, law enforcement conducting surveillance lost the vehicle when it made a turn going toward a shopping center. The plate affixed to the Chrysler is not associated with that

37

vehicle; instead, it is a transportation license plate that is meant to be used by dealers when transporting vehicles. Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that the Chrysler is the vehicle that PANA indicated belonged to him, with a false tag affixed to it.

100.    Later on or about April 23, 2019, law enforcement observed PROFE again meet with PURO at approximately 2:59 pm; however, on this occasion PROFE was driving a black Mercedes bearing tag GCTN44. After the meeting law enforcement conducted surveillance and discovered that PROFE drove to the residence located at 3435 SW 128th Street, Miami. After PROFE's arrival, law enforcement observed a grey Lexus bearing license plate GDQW82, which is registered to an individual with the initials "J.V.A.," parked at the same residence. Law enforcement then observed the Lexus and the Mercedes depart the residence and begin driving in the same direction.

101.    On or about April 23, 2019, at approximately 2:48 pm, PROFE's Second Phone called PANA's First Phone; the call lasted approximately 3 minutes and 46 seconds. During the call, PROFE and PANA discussed PANA creating deposit slips, which PROFE needed to pick up. PANA apologized and explained that he could not take it to PROFE at the moment because "Orian" took his (PANA's) car out real quick. Later, on or about April 23, 2019, at approximately 3:23 pm, PROFE's Second Phone again called PANA's First Phone; the call lasted approximately 5 minutes and 23 seconds. During the call, PROFE asked if PANA could bring all of the stuff down for him. PANA agreed, but indicated that "Orian" left and the stuff was not finished. PANA indicated that he (Orian) possibly went to "Layra's" house or something. Later in the call, PROFE mentioned that "El Loco" drives fast and PANA pointed out that he (PANA) told him ("El Loco") to slow down because if he gets caught, he'll know what's up. Based on my training and

38

experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that during these calls, PANA's reference to "Orian" taking PANA's vehicle and the later reference to "El Loco" driving fast were references to MICHAEL (Alberto Orian Gonzalez-Delgado) driving PANA's vehicle. MICHAEL's driver license is currently suspended; thus, MICHAEL cannot lawfully drive. Furthermore, MICHAEL has a familial connection to a female with the first name "Layra."

102.    On or about April 23, 2019, at approximately 4:28 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 6 minutes and 7 seconds. During the call, PROFE and PURO discussed JIMENEZ traveling between Chicago and Michigan in furtherance of the fraud scheme and when and where JIMENEZ should deposit their proceeds from the scheme. PROFE stated that the "Pariente" should be arriving at PURO's with the stuff. PROFE stated that he was watching the guy (Pariente) turn the street to get to PURO's to drop that stuff off. PROFE told PURO to call someone to make sure they were there to receive what was being dropped off.

## Additional Plans to Advance the Money Laundering Scheme through Check Cashing Stores

103.    On April 24, 2019, at approximately 4:39 pm, PURO called PROFE's Second Phone; the call lasted approximately 3 minutes and 15 seconds. During the call, PURO and PROFE discussed the movement of money between bank accounts. PURO also discussed "the man at the money exchange," suggesting a check cashing store employee, who told PURO that he has "six places" and that they can "give/take to six different places." PURO suggested that they "do 10.5 grand at each place, meaning a total of 70 to 80 [thousand]." PURO also informed PROFE that four occupational licenses were done.

## April 25, 2019 Surveillance

104.    On or about April 25, 2019, at approximately 11:04 am, law enforcement observed

39

a white Chevy Impala bearing Florida license plate 365TJU — registered to PANA — parked close to the Office. At approximately 11:14 am, law enforcement observed a black Mercedes SUV bearing Florida tag GCTN44 and a grey Lexus bearing Florida tag G7828J parked at the residence located at 3435 SW 128th Avenue, Miami.

**April 30, 2019 Surveillance and Intercepted Calls.**

105.    On or about April 30, 2019, law enforcement conducted surveillance in the vicinity of the Office. At approximately 12:52 pm, law enforcement observed a grey Lexus bearing Florida license plate GDQW82 entering the Office complex. The Lexus parked and PROFE exited the passenger side of the vehicle and entered the staircase entrance of the building. The driver of the vehicle remained in the Lexus. At approximately 2:06 pm, law enforcement observed PROFE exit the building with a second male, later identified as MICHAEL. MICHAEL entered a black Lincoln bearing license plate 280TPE and departed the area. Records maintained by DAVID revealed that the Lincoln is registered to a female with the initials "E.N.C." Law enforcement followed the Lincoln to the Miami International Airport, where it was lost in traffic in the departures area for American Airlines.

**Surveillance at the Florida Office**

106.    On or about May 2, 2019, law enforcement conducted surveillance in the vicinity of the Office. At approximately 11:08 am, law enforcement observed a white Ram truck bearing Florida tag BXDX76 arrive and park in the complex parking lot; PANA exited the driver's side of the vehicle. At 1:14 pm, a black Lincoln bearing Florida tag 280TPE arrived at the complex. MICHAEL exited the vehicle carrying a yellow box and what appeared to be a piece of paper. MICHAEL walked toward the stairwell of the apartment complex. At approximately 2:16 pm, PANA walked to the white Ram truck while appearing to talk on a phone; PANA then walked

40

back to the stairwell, appearing to carry a cellular telephone charger.

**"Slingshot" Accounts**

107.   On or about May 2, 2019, at approximately 2:10 pm, PROFE's Second Phone called PURO's Phone; the conversation lasted approximately 2 minutes and 34 seconds.  During the call, PURO advised PROFE that the CHS had a problem at "MB."  PURO explained that the CHS was asked for the last three for the Chase accounts, which was further explained in later calls

108.   On or about May 2, 2019, at approximately 2:17 pm, PROFE's Second Phone called MICHAEL's First Phone; the conversation lasted approximately 4 minutes and 14 seconds. During the call, PROFE told MICHAEL that the CHS's account at MB Financial had been blocked because they noticed that the account from Chase was also the CHS's.  PROFE indicated that he did not think that should be a problem because he is not getting a lot of funds and they use those places like a slingshot to send it back down here.  MICHAEL responded that the MB Financial account has 128 and it is the business account.  PROFE stated that they need to provide an email like the same thing they did the other day showing that those deposits into MB with the copies of those checks having been cleared.

109.   On or about May 2, 2019, at approximately 2:21 pm, PROFE's Second Phone called PURO's Phone; the conversation lasted for approximately 5 minutes and 30 seconds. During the call, PROFE asked if PURO had "the person's" email address.  PURO affirmed and indicated that he will send "it" to "him."  PROFE further told PURO to put WhatsApp on the phone so he (PURO) can send a picture of that to the other guy, to "MICHAEL."  After telling PURO to call MICHAEL, PROFE stated that he (PROFE) would call MICHAEL and requested that PURO give him five minutes.  PROFE told PURO that the CHS is supposed to look like he has three of four million dollars, or even 300,000, and that he should not look like he is just going

41

to wait around for small amounts of money. PROFE instructed PURO to tell the CHS to say that if it is not going to work, then to get a cashier's check in the CHS's name, to close both accounts, and stop doing business with the bank.

110.     On or about May 2, 2019, at approximately 2:27 pm, PROFE's Second Phone again called MICHAEL's First Phone; the call lasted approximately 5 minutes and 32 seconds. During the call, PROFE asked MICHAEL if he had the information to speak with the one who calls him "MICHAEL." MICHAEL confirmed that he had the number. PROFE then asked MICHAEL to call the other individual so that MICHAEL could provide the information of where they are going to send the email. MICHAEL agreed to do it that day and stated that he was looking at the account as they spoke. After MICHAEL discussed various funds and transactions, PROFE stated that he would rather have the guy call MICHAEL. Call data revealed that at approximately 2:47 pm, PURO's Phone called MICHAEL's First Phone; the call lasted approximately 1 minute and 7 seconds.

111.     Reporting by the CHS and consensually recorded calls between the CHS and PURO revealed that the CHS's experience at MB Financial in Chicago is consistent with the information discussed in these calls. More particularly, when the CHS attempted to cash a check written to the CHS from a Chase account, MB Financial sought confirmation that the funds in the Chase account were sufficient to cover the check. In fact, the Chase account is a second operating account for Care. Chase records have revealed that account has been wholly funded by money that was fraudulently obtained from Medicare.

112.     Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I further believe that after receiving this information from PURO, PROFE called MICHAEL, who was able to electronically

42

access the MB Financial account while speaking to PROFE. I thus believe that MICHAEL assists the FMLO in not only fraudulently billing Medicare, but also in the complex, multi-jurisdictional money laundering scheme.

**PANA drives multiple vehicles.**

113. On or about May 3, 2019, at approximately 8:59 am, law enforcement observed a white Dodge Ram, a white Chevy Impala, and a dark Chrysler 300 parked in the driveway of PANA's Residence. All of the vehicles were parked with the license plates towards the residence and could not be seen from the street.

**Additional Surveillance at the Office**

114. On or about May 6, 2019, law enforcement conducted surveillance in the vicinity of the Office. At approximately 11:29 am, law enforcement observed a dark grey Chrysler 300 bearing Florida tag G7828J arrive at the complex and park. PANA was the driver and sole occupant of the vehicle; at approximately 11:30 am, PANA exited the vehicle, obtained an item from the trunk, and then approached the building. At approximately 11:31 am, PANA entered the east stairwell and exited on the fifth floor of the building. At approximately 12:08pm, law enforcement observed a black BMW bearing Florida tag GCTN44 arrive at the Office complex; the BMW parked in a handicap parking space near the entrance of the building. At approximately 1:24 pm, law enforcement observed PROFE exit the building. Shortly thereafter PROFE entered the black BMW and departed the area. At approximately 2:02 pm, law enforcement observed PANA enter the Chrysler 300 and depart the area. At approximately 2:10 pm, PANA returned to the complex and parked. At approximately 2:13 pm, law enforcement observed PANA on the balcony of the fifth floor of the building. At approximately 2:57 pm, PANA departed the area in the Chrysler 300. At approximately 4:10 pm, a black Lincoln was observed entering the parking

43

lot at the complex; MICHAEL exited the vehicle.

**PURO Directs Cash Withdrawals from Five Different Banks**

115. On or about May 6, 2019, the CHS conducted a recorded meeting with PURO, and others. On that date, at approximately 2:02 pm, PURO picked up the CHS in a silver Nissan Rogue in the vicinity of 12890 SW 8th Street, Miami. Law enforcement observed PURO drive the CHS to the Bank of America located at 10081 W Flagler Street in Miami; there, the CHS entered the bank alone and withdrew funds from an account in the CHS's name. The CHS exited the bank and PURO drove the CHS to a TD Bank located at 9201 W Flagler Street in Miami. The CHS again entered the bank alone and withdrew funds from an account in the CHS's name. The CHS exited the bank and PURO drove the CHS to a Regions Bank located at 8373 W Flagler Street in Miami. The CHS entered the bank alone, withdrew funds, and returned to PURO's vehicle. PURO drove the CHS to BB&T Bank located at 7900 W Flagler Street in Miami, where the CHS entered the bank and withdrew funds. PURO then drove the CHS to a Citibank located at 7795 W Flagler Street, followed by a Citibank located at 10805 NW 41st Street in Miami. Thereafter, PURO returned the CHS to the location where PURO picked up the CHS.

**May 7, 2019 Surveillance at the Office and Meetings with PURO and PROFE**

116. On or about May 7, 2019, law enforcement conducted surveillance in the vicinity of the Office. At approximately 11:21 am, law enforcement observed the dark grey Chrysler 300 bearing Florida tag G7828J in the parking lot at the complex. At approximately 12:00 pm, PANA entered the Chrysler 300 and departed the area. At approximately 12:18 pm, law enforcement observed the Chrysler 300 in the parking lot at the Home Depot. At approximately 12:54 pm, law enforcement observed PANA depart the parking lot in the Chrysler 300; at approximately 1:08 pm, PANA arrived at the parking lot at the Office, exited the vehicle carrying what appeared to be

44

two plastic filing bins, and approached the building.

117.   On or about May 7, 2019, at approximately 2:16 pm, PROFE's Second Phone called PANA's First Phone; the call lasted approximately 2 minutes and 13 seconds.  During the call, PROFE told PANA that he (PROFE) needed the US Bank personal card for the CHS because that is the one used to pay for travel expenses.  PROFE indicated that he also needed the personal and business one for PNC.  PANA responded that they were ready.  PROFE asked PANA to meet him halfway so that PANA could give him (PROFE) the cards; PROFE then said he would be there in two minutes, as in down the street from PANA.

118.   At approximately 2:21 pm, a black BMW bearing Florida tag GCTN44 arrived at the parking lot at the Office.  At approximately 2:24 pm, PROFE and PANA appeared to have a brief conversation; PROFE then entered the BMW and PANA entered the Chrysler 300 and both departed from the area.

119.   At approximately 2:29 pm, law enforcement observed PROFE standing outside of the BMW parked in the vicinity of 2451 SW 118 Court, Miami, Florida.  At approximately 2:37 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 1 minute and 40 seconds.  During the call, PURO told PROFE that he (PROFE) could take "that" to PURO's brother at PURO's Residence.  PROFE agreed and said he would go at that time.  The BMW was still present at that location at approximately 2:54 pm.

120.   At approximately 4:16 pm, a black Lincoln bearing Florida tag 280TPE arrived in the complex parking lot at the Office.  MICHAEL exited the vehicle and approached the building. At approximately 5:13 pm, MICHAEL and PANA exited the building; MICHAEL entered the Lincoln and PANA entered the Chrysler 300; both departed the area.  At approximately 5:30 pm, law enforcement observed PANA and PROFE meeting next to PROFE's black BMW in the

45

vicinity of Royal Green Elementary, located at 13047 SW 47th Street in Miami. Thereafter, both vehicles left the area.

121. At approximately 4:54 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 2 minutes and 32 seconds. During the call, PROFE asked PURO where he was because PROFE wanted to take PURO the "little papers." PURO agreed. At approximately 5:38 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 30 seconds. PROFE told PURO that he was there and told PURO to step out. PURO agreed.

**Intercepted Calls and Text Messages Regarding Shell Companies and Bank Accounts, and Surveillance at the Office**

122. On or about May 8, 2019, at approximately 1:59 pm, PROFE's Second Phone called PANA's First Phone; the call lasted approximately 4 minutes and 10 seconds. Due to technical difficulties, only PROFE's side of the conversation was intercepted. During the call, PROFE requested the individual on the line to text him (PROFE) the business and which bank belongs to the business so he can give the information to the guy so he can get that thing. At approximately 2:11 pm, PANA's First Phone sent a text message to PROFE's Second Phone with the following information: "R Wilmar Catering & event," "A Elite lasdcape desing [sic] inc," and "Pnc 9044 [the CHS], Mbf 3539 An, Bom 0012 An, Fbm 8207 An." At approximately 2:22 pm, PROFE's Second Phone called PANA's First Phone; the call lasted approximately 52 seconds. During the call, PROFE thanked PANA for the text message, but specified that he (PROFE) wanted to know if the PNC account for the CHS is for the personal account or the business account. PANA acknowledged PROFE's request. At approximately 2:39 pm, PANA's First Phone sent a text message to PROFE's Second Phone. The text message included, "PNC Ant, RPG Industrial service supply," and "BMO Ant, Ace freight & Cargo transport," and "BMO Ant, Personal."

46

123.    On or about May 8, 2019, law enforcement conducted surveillance in the vicinity of the Office. At approximately 2:55 pm, PANA's Second Phone called MICHAEL's Second Phone, which is associated with "Orian" in open source reporting. That call lasted approximately 38 seconds. At approximately 3:01 pm, PANA left the area driving a white Dodge Ram truck.

124.    At approximately 3:03 pm, MICHAEL's Second Phone called PANA's Second Phone; the call lasted approximately 1 minute and six seconds. Around this time, law enforcement observed a male exit a white Nissan Infiniti, bearing Florida license plate JZXR08 and enter the Dodge Ram on the west side of the Navarro Pharmacy located at 11865 SW 26th Street, Miami Florida. The Infiniti is registered to a female with the first name "Layra," who is legally married to MICHAEL.

125.    At approximately 3:06 pm, law enforcement observed the Dodge Ram drive back to the parking lot at the Office and park. There, PANA and MICHAEL exited the vehicle and entered the stairwell. At approximately 3:11 pm, PANA's First Phone called PROFE's Second Phone. During the intercepted call, PANA told PROFE that the "guy" was "there." MICHAEL then got on the phone and the conversation continued in both English and Spanish. PROFE told MICHAEL that he (PROFE) is getting the "*insurance*." MICHAEL responded, "*yeah, the Worker's Comp*." PROFE confirmed and indicated that he needed the names so that he could get a couple of quotes.

126.    On or about May 8, 2019, at approximately 4:47 pm and 4:48 pm, PANA's First Phone sent the following text messages to PROFE's Second Phone:

Chase personal. Michig
3686 checks are missing
Usbank Personal Michig
3691 checks are missing

47

BOA personal Michig
4168 checks are missing

## May 13, 2019 Surveillance

127.    On or about May 13, 2019, law enforcement conducted surveillance at various locations. At approximately 12:05 pm, law enforcement observed several vehicles parked outside the residence located at 15160 SW 27th Ave, Miami, including a white transit van bearing a Florida license plate beginning with JCF. At approximately 2:06 pm, law enforcement observed MICHAEL and an unidentified male moving an object into the white van; law enforcement then observed the white van depart the residence located at 15160 SW 27th Ave, Miami.

128.    On or about May 13, 2019, at approximately 3:54 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 2 minutes and 29 seconds. During the call, PURO asked if PROFE was going to pick up the worker compensation things, adding that all three were ready. PROFE told PURO that if they are ready, to give them to him (PROFE). After discussing the need to pay for rent in Michigan and Chicago, PURO told PROFE that PROFE could pass by whenever PROFE wanted. At approximately 4:00 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 17 seconds. During the call, PROFE stated that he was "there." PURO responded that his brother was going out. At approximately 4:06 pm, PURO's Phone called PROFE's Second Phone; the call lasted approximately 2 minutes and 39 seconds. During the call, PURO apologized and asked PROFE to return because he (PURO) forgot something for "Madurito." During many intercepted calls, the FMLO refers to JIMENEZ as "Madurito." PROFE agreed to return; later in the call PROFE informed PURO that he was there.

129.    On or about May 13, 2019, at approximately 4:10 pm, PROFE's Second Phone received the following text message from PANA's First Phone:

48

[CHS] personal
Citibank - Cheques
Iberia - Cheques
Gables Industrial Cleaning
Iberia - Cheques y Login
Excel Consulting Group
Suntrust - Cheques

130.    On or about May 13, 2019, at approximately 4:14 pm, PROFE's Second Phone called PANA's First Phone; the call lasted approximately 4 minutes and 17 seconds. MICHAEL answered the phone and greeted PROFE. PROFE asked MICHAEL if he was still "there." MICHAEL confirmed, and indicated that he was on the phone. MICHAEL mentioned that he sent PROFE a message. PROFE confirmed that he received it. Later in the call, MICHAEL asked if the guys finished making the deposits. PROFE confirmed and MICHAEL added that he had two or three deposits that needed to be done. PROFE stated that they can go tomorrow if MICHAEL wants to leave the deposits for the Chi, if they have any. PROFE asked if they have any for this week and MICHAEL said, "of course." PROFE indicated that he would be there soon.

131.    At approximately 4:48 pm, PROFE arrived in the parking lot at the Office in the black BMW bearing license plate GCTN44; PROFE parked and entered the building. At approximately 6:05 pm, 6:09 pm, and 7:20 pm, PROFE and PURO spoke over the telephone regarding meeting up later at a Navarro.

132.    At approximately 7:33 pm, PROFE, PANA, and MICHAEL exited the building. PROFE entered the black BMW and departed the area while PANA and MICHAEL appeared to engage in conversation in the parking lot at the Office. PANA then entered the white Chevy Impala bearing license plate 365TJU and MICHAEL entered the white Ford van bearing license plate JCFW74; both of these vehicles are registered to PANA. PANA departed the area and was not followed. MICHAEL departed the area and drove back to the residence located at 15160 SW 27th

49

Ave, Miami, where MICHAEL exited the van.

133.    At approximately 7:34 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 20 minutes and 36 seconds. During the call, PURO and PROFE realized that they had gone to different Navarros; they then agreed to both drive to PURO's Residence and meet there. PURO and PROFE then proceeded to discuss the items that PROFE was taking PURO. PROFE indicated that he was taking detailed labeled envelopes for each thing. PROFE went on to explain the various cards that he (PROFE) put in different envelopes, and further explained that he did small deposits of approximately 9 for iBeria and Bank United, and a big deposit for Wells Fargo that was around 280. PURO and PROFE further discussed the accounts for which they needed to obtain checks, and PURO explained that he had obtained checks from SunTrust and iBeria starting at 7000. PROFE also stated that they still had about 1.6 or 1.7 in the Chase account and because it would be closing the following Tuesday, he (PROFE) wanted them to return on Sunday so that they could be ready on Monday if anything happens. PROFE further stated that after all this ended the party would be ending and all they would have to do is deal with trickles. PURO stated that he could not wait until he received his "melon," meaning a million, that he has never had a "melon," and that he could not imagine how it must feel to have that. PROFE then instructed PURO to return on Friday because it would be the first time going to Hialeah and PROFE preferred PURO to do it because he already knew where to go.

**MICHAEL and PROFE Work in Furtherance of the FMLO at the Office.**

134.    On or about May 14, 2019, at approximately 2:38 pm, PROFE's Second Phone received a call from PANA's First Phone; the call lasted approximately 3 minutes and 7 seconds. During the call, PANA asked PROFE about the CHS's US Bank accounts and discussed the status of a check. PROFE told PANA that he (PROFE) was about to arrive. PROFE further stated he

50

had everything ready for the guy and the only thing needed is the signatures and to put it into envelopes.

135.    On or about May 14, 2019, at approximately 2:55 pm, law enforcement observed PANA leaving the Office complex driving a white Chevy Impala bearing Florida tag 365TJU. At approximately 2:57 pm, MICHAEL arrived at the Office complex driving a Ford van bearing Florida tag JCFW74. MICHAEL exited the vehicle, entered the building, and entered an apartment on the fifth floor of the building while appearing to talk on the phone. At approximately 3:04 pm, MICHAEL exited the apartment and entered the Ford van; approximately one minute later, MICHAEL exited the van while appearing to be on the phone, entered the building, and entered an apartment on the fifth floor.

136.    At approximately 3:51 pm, PANA's First Phone called PROFE's Second Phone; the call lasted approximately 1 minute and 26 seconds. During the call, PROFE asked MICHAEL how long he (MICHAEL) thought it would take. MICHAEL responded that he was there because the other guy was not there and that he (MICHAEL) was doing them already. PROFE indicated that he looked for the little papers and would help him (MICHAEL) in a little while. PROFE stated that he would pass by in a couple of minutes. MICHAEL requested that PROFE bring some food like McDonald's.

137.    At approximately 3:53 pm, PANA's First Phone called PROFE's Second Phone; the call lasted approximately 2 minutes and 24 seconds. During the call, MICHAEL asked about TCF Bank and indicated that he had a receipt from the 8th and the card from a representative inside. After PROFE explained that they both have accounts at TCF and instructed MICHAEL to look at the last four, MICHAEL specified that he was looking at a printout from TCF for Care. MICHAEL further added that it was from JIMENEZ from his personal account. PROFE clarified

51

that they had forgotten one cash out and that they could not find the check. MICHAEL responded that he was going to make a new check for it and leave it at that. PROFE suggested that if he wanted to make one, he could make one bigger, for whatever that was worth and whatever this week was worth. MICHAEL stated it was 94. PROFE agreed that was good enough. PROFE reminded MICHAEL that they needed the EFT, too. PROFE indicated that he (PROFE) would then go help him (MICHAEL).

138.   At approximately 5:16 pm, PROFE's Second Phone called ALEX's Phone; the call lasted approximately 14 minutes and 3 seconds. During the call, PROFE and ALEX discussed the scheme and PROFE informed ALEX that for the next week they would start with the little papers and that probably that Friday, they would have papers for him. ALEX responded that once he (ALEX) got the plastic on Friday, he would do his rounds.

139.   At approximately 5:26 pm, while the call between PROFE and ALEX was ongoing, law enforcement observed PROFE driving a white BMW bearing Florida tag PE299W enter the Office complex and park the vehicle. PROFE exited the vehicle while appearing to talk on a phone and carrying what appeared to be a fast food bag, entered the building, and entered an apartment on the fifth floor.

140.   At approximately 5:52 pm, PROFE's Second Phone called PURO's Phone; the call lasted approximately 1 minute and 17 seconds. During the call, PROFE asked about access to the iBeria account. PURO indicated that he (PURO) had a paper with everything detailed for PROFE. PURO added that the checkbooks were done and PURO and PROFE agreed to meet. After several calls regarding when and where they would meet and a card from BMO Bank that may have been missing, PURO and PROFE eventually agreed to meet at PURO's Residence.

52

141.    At approximately 8:56 pm, PROFE exited the Office building and entered the white BMW. At approximately 9:05 pm, PROFE told PURO he was "there."

**May 16, 2019 Intercepted Calls Regarding Check Cashing Stores.**

142.    On or about May 16, 2019, at approximately 11:05 am, PROFE's Second Phone received a call from JC's Phone; the call lasted approximately 9 minutes and 40 seconds. During the call, JC mentioned that he had just seen the guy from Okeechobee. JC explained that the "Okeechobee guy" does not want one "pioneer," meaning nominee owner, to write to another "pioneer" and then in turn have that "pioneer" write to this same one. JC explained that this will form a circle, and it is seen more. PROFE responded that this is the way it was before, but that if the "Okeechobee guy" does not want it this way, it is understandable. JC and PROFE agreed that the one writing does not need anything, but the one who receives needs everything. JC confirmed that it is much better if they use worker's comp. PROFE explained that only one of the three was ready. JC added that the Okeechobee guy requested for JC to send one for the next day and that the other could go Monday or sometime the following week. JC confirmed that the Okeechobee guy wanted to sign "them" up and PROFE agreed to give JC the papers for the forms. After further conversation, PROFE asked if both places want checks made via the computer, to which JC responded that he was not told anything about that for the one on 8th. JC and PROFE agreed to sign one up the following day without papers, meaning at the Okeechobee guy's place. JC then requested that PROFE send the same driver as last time and indicated that it is a problem that the driver knows who he (JC) is and vice versa, and repeated that he does not want to bring someone new into the mix.

143.    Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that during this

53

conversation, JC and PROFE discussed the structure of how the FMLO would launder money through check cashing stores to make the transactions appear legitimate. I believe that the "Okeechobee guy" is JC's contact at a check cashing store located in the vicinity of Okeechobee Road in Hialeah. In order to open an account through which a business may cash checks at a check cashing store, certain regulations must be followed. As described here, the "Okeechobee guy" has indicated to JC that in order for the nominee owners to open accounts at that check cashing store, they would need to show proof of payment for an occupational license and worker's compensation insurance. JC and PROFE further discussed that only one nominee owner or "pioneer" would open an account at the check cashing store and the two others would write checks to that one with the account. The "Okeechobee guy," unlike other check cashing stores, would not allow two nominee owners to opens accounts at his store and cash checks for each other, because that appears more suspicious. Furthermore, only the "Okeechobee guy" was requiring that the checks be "computerized," meaning printed, as opposed to hand-written.

**Meeting with ALEX and PURO to Withdraw Money at a Check Cashing Store**

144. On or about May 17, 2019, the CHS conducted a consensual recording with ALEX, PURO, and others. That morning, ALEX drove the CHS to various banks, including Bank of America, Amerant, iBeria, and CitiBank where the CHS went inside and withdrew money. The CHS relinquished the funds to ALEX.

145. When the CHS was done with ALEX, the CHS went with PURO, CHAMACO, and JIMENEZ to various places. One of the locations they went was a check cashing store located off Okeechobee and NW 95th Street, in Hialeah Gardens. While there, the CHS was told to wait outside while JIMENEZ went inside to "register." Thereafter, the CHS and JIMENEZ made

various deposits and attempted to get an additional "occupational license" for one of the corporations opened in the CHS's name.

146.    Call data revealed that prior to May 17, 2019, JC's Phone was not in contact with PURO's Phone. However, on or about May 17, 2019, JC's Phone and PURO's Phone were in contact on many occasions, beginning at approximately 9:46 am for approximately 2 minutes and 33 seconds; as well as at approximately 10:24 am (38 seconds), 11:06 am (1 minute and 4 seconds), 11:15 am (1 minute and 48 seconds), 11:35 am (1 minute and 10 seconds), 12:30 pm (10 seconds), 2:36 pm (56 seconds), 7:26 pm (4 minutes and 25 seconds), and 8:05 pm (2 minutes and 44 seconds). This contact with PURO shows JC's role in facilitating the FMLO establishing accounts at check cashing stores.

**Surveillance of JC**

147.    On or about May 20, 2019, at approximately 12:20 pm, location information associated with JC's Phone indicated that the phone was located at JC'S Residence. At approximately 12:25 pm, PROFE's Second Phone called JC's Phone; the call lasted approximately 2 minutes and 58 seconds. During the call, PROFE asked if the "pariente" was registered; JC affirmed that one of them was. JC continued that the guy called him (JC) and he (JC) was going to inform PROFE that the guy would take the same one they took to Hialeah to 8th. After PROFE and JC discussed getting worker's compensation insurance for various companies, PROFE told JC to tell the guy that he will take it to him this week. JC responded that it could be taken to the guy the following day. PROFE said he would prepare it for him.

148.    At approximately 12:28 pm, law enforcement observed JC depart JC'S Residence driving a Chevy Tahoe. At approximately 12:37 pm, location information associated with JC's Phone indicated that the phone was located close to Florida International University ("FIU"),

55

located on 8th Street; at that time, law enforcement observed JC driving on 8th Street, in the vicinity of FIU. At approximately 12:40 pm, law enforcement observed JC arrive at an AutoZone located at 9806 SW 8th Street; shortly thereafter, at approximately 12:45 pm, law enforcement observed JC inside AutoZone. At approximately 12:51 pm, location information associated with JC's Phone revealed that the phone was located in the vicinity of the AutoZone. At approximately 12:52 pm, law enforcement observed JC depart the AutoZone in the Tahoe. At approximately 1:05 pm, location information associated with JC's Phone revealed that the phone was located in the vicinity of the parking lot near the intersection of Coral Way and SW 122nd Avenue; at that time, law enforcement observed JC drive into the parking lot, drive through the lot multiple times, and then exit the parking lot going north on SW 122nd Avenue. At approximately 1:07 pm, law enforcement observed JC arrive at JC's Residence. At approximately 1:10 pm, law enforcement observed JC appearing to work on the Honda Pilot that was parked in the vicinity of JC's Residence. At approximately 1:21 pm, location information associated with JC's Phone revealed that the phone was located in the vicinity of JC's Residence.

149.    Later, on or about May 20, 2019, at approximately 2:40 pm, law enforcement observed JC leave JC's Residence and drive the Honda Pilot to 8150 SW 8th Street. There, law enforcement observed JC walk up the stairs to the second floor of the building, unlock and door, and enter the location marked "JV & Son Security" on the window. Records maintained by the Florida Division of Corporations revealed that J.V. & Son Security Services Corp is registered to Jose Valladares (JC), at 8150 SW 8 St, Suite 218, Miami, Florida—the same location where law enforcement observed JC on that day.

150.    Further investigation revealed that a Boost Mobile store is located in Suite 116, in the same building as JC's business. Records maintained by the Florida Division of Corporations

56

revealed that 8150 SW 8th Street, 116, Miami, Florida is the principal address of Ecelulares Corp. Subscriber data associated with PROFE's First Phone, PROFE's Second Phone, PROFE's Third Phone, PANA's First Phone, and Michael's First Phone revealed that the service for all of these phones was initiated at Ecelulares Corp. Furthermore, intercepted calls revealed that JC is the individual who acquires the phones that PROFE uses in furtherance of the FMLO.

151.   On or about May 23, 2019, at approximately 3:02 pm, PROFE's Second Phone called JC's Phone; the call lasted approximately 9 minutes and 17 seconds. During the call, JC informed PROFE that he (JC) needed to tell PROFE about something that happened to him (JC). JC explained that someone was following him. PROFE asked if JC got stopped. JC responded that he called the police on the guy and told the police officer that if the person following him was law enforcement, he did not care, but if it was a criminal, JC did care. JC further explained that this happened the day after he saw "El Loquito" or the "Crazy." JC complained the El Loquito is not aware of his surrounding and indicated that he (JC) prefers to meet with the "Primo" instead of El Loquito. PROFE explained that El Loquito lives with his brother and his elderly parents who are ill and that he (El Loquito) must take care of his parents by changing their diapers. JC explained that he does not distrust El Loquito in that sense, but only that he is not aware of his surroundings. PROFE agreed.

152.   JC further described the incident when someone was following him, stating that he could not remember whether it happened on Thursday or Friday. JC stated that after he noticed the car following him, he thought twice at first because at that time he was not working and he did not have anything on him. But he explained that when the officer came, JC pointed to the car that was following him. The car left and the officer lost him. When the officer came back, JC asked the officer to write down in his report that he (JC) is carrying a gun and next time he is going to

shoot the individual in the head.  JC further postulated that the police had been in the shopping center looking for someone and PROFE and JC agreed that the shopping center is not a good place to do transactions.  JC indicated that he was waiting for the "Okeechobee guy" at the barbershop, but that because he always waits in the back to avoid being seen, he (JC) got stuck in the midst of boxes being unloaded and transferred to a car.  PROFE proposed that it is better for JC to take the items to his (JC's) house and then later on, to meet PROFE and do their transaction inside a supermarket.

153.    Later in the call, PROFE and JC discussed how many individuals are registered at the location on 8th and that one is missing worker's comp.  JC and PROFE discussed how they could get "150 per week."  JC stated that they need to start now, to which PROFE agreed.  PROFE indicated that he is going to change this phone for the other one that he had purchased.  JC told PROFE to let him (JC) know so that JC could change his phone at the same time.

154.    Based on my training and experience, the facts of this investigation, and my conversations with other law enforcement officers and linguists, I believe that during this call, JC explained what happened when law enforcement was conducting surveillance on Tuesday, May 21, 2019.  I thus believe that JC inaccurately indicated this incident occurred on the previous Thursday or Friday.  Further, I believe the individual referred to as "El Loquito" is PURO, who is known to live with his brother and elderly father.  The investigation has revealed that PURO's Phone and JC's Phone were in communication approximately 30 times from on or about May 17, 2019 to on or about May 21, 2019 and that JC facilitated PURO taking the CHS and JIMENEZ to the check cashing store off of Okeechobee Road to register an account on or about May 17, 2019. I further believe that JC and PROFE are continuing to work together to launder money for the

58

FMLO and are attempting to conceal their criminal activity, at least in part, by obtaining and using new phones on a regular basis.

**Nu-Wave and Tri-County HHAs show FMLO's Pattern of Conduct**

155.    During the course of the investigation and through coordination with the FBI Detroit Field Office, law enforcement learned that a similar pattern of health care fraud had been replicated multiple times in the Detroit area.  Those investigations revealed that other HHAs — including Nu-Wave and Tri-County — had been purchased in nominee owners' names and appeared to follow a similar pattern of fraud, by submitting a large number of RAPs for home health services that were not rendered, and then laundering the proceeds through numbers shell companies and straw accounts.    Law enforcement officers in Michigan provided ATM photographs of an individual who withdrew the proceeds of health care fraud associated with Nu-Wave, including two ATM withdrawals for $3,000 each on or about January 12, 2018 in Miami. The CHS positively identified that individual as ALEX.

156.    Further investigation into Nu-Wave has revealed that Nu-Wave was purchased in a nominee owner's name in or around October 2016.  As a result of fraudulently billing Medicare for RAP claims, more than $36,000,000 was paid and withdrawn from in or around October 2016 through in or around April 2018, and the criminal proceeds were laundered in a manner consistent with the scheme described herein.  Law enforcement identified more than 140 bank accounts that were associated with this scheme to launder the fraudulent funds obtained through fraudulently billing Medicare for services that were never rendered.  The corporations associated with the bank accounts followed similar naming conventions as discussed further herein *supra*.  For example, one nominee owner had corporations such as Andrades Staffing Services Corp, Ebiz It Corp, Eze Cleaning Service Inc, Macro Data Integration Corp., Precision Equipments [sic] Unlimited Corp.,

Superior Representation Inc., and several personal accounts. Another nominee owner had corporations such as A1 Supplies & Inventory Inc, A1 Supplies and Inventory Services, NR Staffing Services Inc, Best Results Marketing Inc, and several personal accounts. Another nominee owner had corporations such as Best American Courier Corp, Best Network & Maintenance Corp., Best Trucking Transportation Corp, JRG Carpentry Inc, and several personal accounts.

157.    Law enforcement officers in Detroit further identified Tri-County as having been purchased in the name of a different nominee owner on or about February 13, 2017. As a result of fraudulently billing Medicare for RAP claims, approximately $7,400,000 was paid and withdrawn from in or around February 2017 through in or around July 2018 after the money was laundered consistent with the scheme described herein.

158.    The Program Integrity Manager for AdvanceMed reported that on March 26, 2019, Care submitted its first claims for payment for approximately ten beneficiaries. All of the beneficiaries were from outside the state of Michigan and each beneficiary had a different prescribing physician, all of whom were from Michigan. Furthermore, each of these beneficiaries had also been billed in other schemes tied to the FMLO, including at the Nu-Wave and Tri-County HHAs. AdvanceMed further reported that the total value of the ten claims that were submitted, after three were re-submitted after correcting a diagnosis code, was approximately $20,209.[4]

159.    Thereafter, the FMLO exponentially increased its submission of fraudulent claims to Medicare for services that were never rendered. The Program Integrity Manager for

---

[4] AdvanceMed further advised that the value of the claims could change until they were actually paid and that the final claims data would not be available in the electronic system to produce to law enforcement until two to three weeks after the claims were paid.

AdvanceMed reported that as of May 14, 2019, Medicare had scheduled $9,622,019.26 to be paid as a result of 4,549 RAP claims being submitted on behalf of Care to Medicare. Furthermore, on May 9, 2019, Care submitted 13,030 RAP claims in a single day, seeking payment of approximately $27,600,000. On or about May 13, 2019, a RAP Suppression was entered in the system to ensure that no additional funds would be finalized and paid. In other words, the FMLO billed Medicare for over $37,000,000 for services that were never rendered. The FMLO received more than $9,000,000 in connection with this scheme and have taken steps to begin laundering that money through corporate and personal accounts that were opened in the names of the CHS and JIMENEZ, as further described below.

160.    Claims data for Care reveals that Care billed for at least two dead beneficiaries. Care billed twice for home health services purportedly taking place in March of 2019 for a beneficiary who died in 2011. Additionally, this beneficiary lived in Pompano Beach, Florida and the services were requested by a doctor in Manistee, Michigan. Care also billed for eleven post-mortem home health treatments of a beneficiary who lived in Westbury, New York and died in 2005. The second beneficiary's home health services were purportedly requested by doctors in six Michigan cities: Detroit, Flint, Gladwin, Grand Rapids, Marquette, and Southfield and took place between April of 2018 to March of 2019.

161.    As of April 23, 2019, the final billing data revealed that 319 of the beneficiaries billed at Care were also billed at Tri-County, which accounts for 76% of all of the beneficiaries that were billed at Care. The amount billed for these 319 beneficiaries between the two schemes totaled approximately $11,379,253. In addition, seven beneficiaries billed at Care were also billed at Nu-Wave; the total amount billed for these beneficiaries between the two schemes totaled approximately $636,963.

162.     Moreover, the investigations into Nu-Wave and Tri-County revealed that the personal identifying information and Medicare information for the beneficiaries and the provider information for the purported treating physicians were stolen; in other words, the beneficiaries and doctors were not complicit in the FMLO's criminal activities.

163.     Information provided by the Program Integrity Manager for AdvanceMed revealed that the FMLO used a similar pattern of billing for services that were never rendered in Nu-Wave, Tri-County, and Care. More particularly, as MICHAEL stated on April 8, 2019, the FMLO "aggressively" billed Medicare for thousands of beneficiaries for services that were never rendered and could not possibly have been rendered on a single day. For example, during Nu-Wave, the FMLO submitted more than 1,000 RAP claims on approximately six different days; during Tri-County, the FMLO submitted more than 1,000 RAP claims twice; and during Care, the FMLO submitted more than 1,000 RAP claims on three days.

164.     Although the financial analysis is ongoing, law enforcement has identified similarities in the ways in which the proceeds of health care fraud involved in each of these schemes was laundered. For example, Nu-Wave received Medicare deposits from March 2, 2017 through October 23, 2017 totaling approximately $36,301,622.11 over approximately 53 transactions. This amount was paid into a Nu-Wave corporate JP Morgan Chase account ending in 5532; the nominee owner was the signatory on the account. Tri-County received Medicare deposits from October 26, 2017 through March 28, 2018 totaling approximately $7,410,233.72 over approximately 36 transactions. This amount was paid into a Tri-County corporate JP Morgan Chase account ending in 9769; the nominee owner was added as a signatory on the account on or about November 7, 2017. In the present iteration of this scheme, a corporate JP Morgan Chase account was opened for Care with the CHS as the signatory; from April 2, 2019 through May 13,

2019, this account received approximately $9,622,019.26 over approximately 28 transactions. In each of these schemes, when the proceeds of health care fraud flowed into the first level operating account, practically all of the funds were quickly electronically transferred to another corporate account for the HHA with the nominee owner of that HHA as the signatory on the account. Thereafter, the money flowed from the second operating account into the first tier of the money laundering accounts, primarily as a result of nominee owners making deposits into each other's accounts. From there, the money flowed into additional money laundering accounts. At each stage, after leaving the first level operating account, some money was withdrawn as cash, including as withdrawals at ATMs and counter transactions inside banks. As shown in Nu-Wave and Tri-County, and as discussed during intercepted calls and consensual recordings above, cash was withdrawn at check cashing stores in the final stage.

**The FMLO Members Conspired to Misrepresent to Medicare Who Owns Care**

165.    Even though the FMLO members are the true owners of Care, PURO and others directed the CHS to sign and cause to be submitted to Medicare enrollment documents falsely and fraudulently representing that the CHS was the owner of the agency.

166.    Specifically, records maintained by Medicare and the Medicare contractors show that the CHS signed and caused to be submitted Medicare enrollment applications (CMS-855A) that identified CHS as the owner, in whole or in part of Care in or around November 2018. At PURO's direction, the CHS, who does not read or write in English, signed each of these applications, certifying (i) that he had read the contents of the application and that the information contained therein was true, correct, and complete, and (ii) that he would abide by the Medicare laws, regulations, and program instructions applicable to Care.

167. Based on the foregoing, I respectfully submit that probable cause exists to believe that Eduardo Rubal, a/k/a "Profe" ("PROFE"); Hector Suarez Gonzalez, a/k/a "Pana" ("PANA"); Alberto Orian Gonzalez-Delgado, a/k/a "Michael" ("MICHAEL"); Vicente Gonzalez Acosta, a/k/a "Puro" ("PURO"); Alexander Fernandez, a/k/a "Alex," a/k/a "Socio" ("ALEX"); Jose Carlos Valladares Rivera ("JC"); Yaxing Tapanes, a/k/a "Chamaco" ("CHAMACO"); and Antonio Jimenez ("JIMENEZ") have, beginning at least as early as in or around October 2016 and continuing through the present, conspired to commit health care fraud, in violation of Title 18, United States Code, Sections 1347 & 1349; and conspired to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h).

FURTHER YOUR AFFIANT SAYETH NOT.

Jamie A. Garman, Special Agent
Federal Bureau of Investigation

SWORN TO AND SUBSCRIBED
before me this  30ᵗʰ day of May, 2019.

HONORABLE WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

64